CONNECTICUT RESOURCES RECOV-
ERY AUTHORITY, and The Towns of
Trumbull, Fairfield and Monroe, Con-
necticut, Plaintiffs-Appellants,

Town of Greenwich, Connecticut,
Intervenor-Plaintiff,

v.

OCCIDENTAL PETROLEUM CORPORA-
TION, Occidental Resource Recovery
Systems, Inc., and Compaction Systems
of Bridgeport, Inc., Defendants-Appel-
lees,

Resource Recovery Associates, Inc., and
CEA–OXY Resource Recovery
Associates, Defendants.

Nos. 646, 648, Dockets 82–7758, 82–7792.

United States Court of Appeals,
Second Circuit.

Argued Nov. 17, 1982.

Decided April 6, 1983.

W. Cullen MacDonald, New York City
(Richard L. Sigal, Frederick C. Bauman,
Thomas W. Pippert, Hawkins, Delafield &
Wood, New York City, and John C. Yavis,
Jr., Lissa J. Paris, Murtha, Cullina, Richter
& Pinney, Hartford, Conn., of counsel), for
plaintiff-appellant Connecticut Resources
Recovery Authority.

Ralph Palmesi, Bridgeport, Conn., for
plaintiff-appellant Town of Trumbull.

Noel R. Newman, Fairfield, Conn., for
plaintiff-appellant Town of Fairfield.

James P. White, Trumbull, Conn., for
plaintiff-appellant Town of Monroe.

Jay F. Gordon, New York City (Martin F.
Brecker, Martha R. Overall, Debra A. Roth,
Phillips, Nizer, Benjamin, Krim & Ballon,
New York City, of counsel), for defendants-
appellees Occidental Petroleum Corp. and
Occidental Resource Recovery Systems, Inc.

Tyler, Cooper, Grant, Bowerman &
Keefe, New Haven, Conn., for defendant-
appellee Compaction Systems of Bridgeport,
Inc.

Before VAN GRAAFEILAND, MES-KILL and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

The Connecticut Resources Recovery Authority and three Connecticut towns appeal from an order of the United States District Court for the District of Connecticut, Ellen B. Burns, *Judge,* denying their motion for a preliminary "status quo" injunction that would have required defendants Occidental Petroleum Corporation and Occidental Resource Recovery Systems, Inc. to continue performing certain contested contractual obligations pending arbitration of a dispute over the existence and extent of those obligations. The district court denied relief because the contract's status quo provision was not intended to cover the disputed obligations, and because plaintiffs had failed to satisfy the traditional equitable prerequisites for specific performance.

On appeal, plaintiffs challenge the district court's interpretation of the status quo provision, its determination that the dispute was governed by ordinary principles of equity, and its application of those principles to the circumstances of this case. Because we conclude that Judge Burns applied the proper standard and that the findings supporting her conclusions of no irreparable harm and an available adequate remedy at law were not clearly erroneous, we affirm the denial of injunctive relief.

## BACKGROUND

This dispute arises out of a complex cluster of contracts entered into by the Connecticut Resources Recovery Authority (CRRA) pursuant to its statutory mandate to establish regional resource recovery systems for the processing of solid wastes in Connecticut. *See* Conn.Gen.Stat. §§ 19-524p *et seq.* (1977). At the heart of the dispute is a contract CRRA entered into in March 1976 with CEA–OXY Resource Recovery Associates (CEA–OXY), a joint venture comprised of Resource Recovery Associates, Inc., which is a wholly owned subsidiary of Combustion Equipment Associates, Inc. (CEA), and Occidental Resource Recov-

ery Systems, Inc. (ORRSI), which is a wholly owned subsidiary of Occidental Petroleum Corporation (Occidental). In this contract, which was "unconditionally and irrevocably" guaranteed by both CEA and Occidental, CEA–OXY agreed to design and construct a commercial scale, waste-to-fuel conversion system for CRRA's pilot project in Bridgeport, Connecticut. Although the contract established March 1, 1978 as the scheduled operation date for the system, it also obligated CEA–OXY to provide certain "interim services" beginning December 23, 1976 and continuing until the system achieved commercial operation. These interim services included maintenance of the system's facilities and, more importantly for present purposes, the hauling and disposal of solid wastes produced by the participating municipalities. The rate that CEA–OXY was entitled to charge the municipalities for these hauling and disposal services during the construction period was fixed by the contract, subject to escalation in accordance with the cost-of-living index.

Both parties agreed in section 213 to waive any rights they might have "by statute or otherwise, to terminate, cancel or rescind this Agreement except in accordance with the express terms thereof." This language was reinforced by section 305, which provided, with exceptions not pertinent to this appeal, that CEA–OXY had "no right to terminate this Agreement or to terminate any of its obligations hereunder". The parties also agreed in section 404 that "[a]ny and all disputes and differences pertaining to or arising out of this Agreement or the breach thereof shall finally be settled by arbitration". Section 404 further provided that "[t]he parties shall continue to perform their obligations under this Agreement during the pendency of any arbitration proceeding." It is this "status quo" provision that plaintiffs seek to specifically enforce in this action.

Immediately after the contract was executed in March 1976, CEA–OXY was permitted by CRRA to subcontract its responsibilities to CEA, which soon began construction of the Bridgeport plant. CEA

encountered substantial difficulties, however, and was unable to keep pace with the schedule established by the contract. As of October 1980, when construction was discontinued, the plant was still far from complete.

Throughout the construction period, CEA provided the interim services required by the contract without interruption. On October 20, 1980, however, CEA declared bankruptcy. Two months later when the United States Bankruptcy Court for the Southern District of New York permitted CEA to disaffirm its obligations under the subcontract, ORRSI immediately assumed responsibility for the functions theretofore performed by CEA. While it did not resume construction of the Bridgeport plant, ORRSI directly provided all of the required interim services until September 1981, when it entered into a five-year contract with Compaction Systems of Bridgeport, Inc. (Compaction Systems), under which Compaction Systems agreed to transport and dispose of the solid wastes produced by the participating municipalities. Since that time, ORRSI has retained responsibility for maintaining the system's facilities and for operating the five local "transfer stations" where wastes that have been removed from the municipalities are temporarily stored en route to various landfill locations.

The series of legal maneuvers and counter-maneuvers which culminated in this lawsuit began in November 1981, when, with construction at a standstill, CRRA filed a demand for arbitration to compel Occidental to honor its guarantee of CEA–OXY's obligation to complete the system. Occidental promptly retaliated by filing suit in the district court to stay the arbitration on the ground that it had never agreed to arbitrate its guarantee liability. At the same time, Occidental informed CRRA that the interim services, which it was then providing at a significant loss under the terms of the contract, would be discontinued as of January 15, 1982. CRRA responded by initiating an action in state court to compel Occidental to arbitrate; Occidental removed the action to the Connecticut district court. With both actions pending in federal court, the parties conducted settlement negotiations for roughly six months, during which ORRSI continued to provide the interim services at a loss.

After it became apparent that the negotiations would not succeed, ORRSI filed against CRRA an arbitration demand of its own. In the demand, ORRSI contended that the system could never be built in accordance with the specifications of the contract, and that under the doctrine of impossibility of performance, it was excused from its obligations both to construct the plant and to provide the interim services. Simultaneously, ORRSI again announced that the interim services would be terminated, this time as of July 16, 1982. However, ORRSI later agreed to defer termination of the services pending resolution of any prompt request by CRRA for judicial intervention. This was no small concession, since at $24 per ton the contract price for interim garbage disposal was roughly $7 per ton below its cost, a spread which ORRSI estimated was causing it to lose roughly $100,000 a month.

CRRA and the Towns of Trumbull, Fairfield, and Monroe then commenced the instant action in state court against Occidental, ORRSI, CEA–OXY and Compaction Systems, seeking to compel the continued performance of the interim services pending arbitration of Occidental's request for relief from the contract. After Occidental removed the case to federal district court, the Town of Greenwich intervened as a plaintiff. Following a three day hearing, the district court denied plaintiffs' motion for a preliminary injunction in an unreported opinion dated October 4, 1982.

Reasoning that our decision in *Guiness-Harp Corp. v. Joseph Schlitz Brewing Co.,* 613 F.2d 468 (2d Cir.1980), required a two-part inquiry, the district court focused first on "whether the contract plainly intended maintenance of the status quo pending arbitration", and second, on "whether plaintiffs have met the traditional test for specific performance of a contract". Following these guidelines, the district court conclud-

ed initially that the failure of the construction agreement to "expressly condition termination of interim services on prior arbitration" suggested "that maintenance of the status quo with respect to continued performance of all duties, including the provision of interim services, was not contemplated by the parties." Alternatively, the district court concluded that specific performance was inappropriate because plaintiffs had failed to establish either the lack of an adequate remedy at law or that they would suffer irreparable harm if Occidental and its subsidiary were permitted to terminate the interim services.

Recognizing, however, that an abrupt termination of the interim services would expose the public to irreparable harm, the district court ordered ORRSI to maintain the status quo until October 16, 1982 so that plaintiffs could arrange for an orderly transition during the intervening 12 days. The district court refused to grant plaintiffs' motion for an injunction pending appeal, but on October 19, 1982 a panel of this court granted plaintiffs' application for a preliminary injunction pending appeal and ordered that the appeal be expedited.

On appeal, plaintiffs contend, first, that Judge Burns disregarded the plain language of the status quo provision, and compounded that error by excluding extrinsic evidence of the parties' intent which suggested that the provision should be interpreted expansively, rather than restrictively. Second, they argue that Judge Burns misapplied the law insofar as she reasoned that plaintiffs were required to satisfy the traditional equitable requirements for specific performance as a prerequisite to obtaining a status quo injunction. Third, plaintiffs claim that even if an equitable showing were required, they have more than adequately demonstrated that they are entitled to relief. Finally, they assert that Judge Burns erroneously refused to consider evidence of certain potential hardships that would befall them if ORRSI were permitted to terminate the interim services.

Because of the conclusions we reach with respect to the equitable issues, it is unneces-

sary to decide either whether Judge Burns erroneously construed the contract or whether she erroneously excluded extrinsic evidence bearing on its meaning. For purposes of this appeal, therefore, we assume that the parties intended that the status quo provision would extend to the interim services, and we confine our discussion to the applicable standard and the particular equities of the case.

## DISCUSSION

Both sides agree that our decision should be guided by *Guiness-Harp v. Joseph Schlitz Brewing Co., supra*. There, Guiness was authorized to distribute certain Schlitz products under an agreement that had no fixed duration, but instead identified certain conditions upon which it could be terminated. Among those conditions was prior arbitration, which the parties agreed would be the exclusive remedy for all disputes. Dissatisfied with Guiness's performance, Schlitz attempted to terminate the distributorship but did not first seek arbitration. Guiness sued to compel arbitration and obtained a preliminary injunction maintaining the status quo. On appeal, this court affirmed, viewing the record as establishing "that the risk of irreparable injury to Guiness without an injunction substantially outweighed any hardship to Schlitz if an injunction were issued." 613 F.2d at 473.

In a context of convincing equitable factors, the *Guiness-Harp* panel held that the district court's injunction enforcing the status quo provision was supportable under either of two approaches. The contract provision could have been regarded either as part of the obligation to arbitrate, subject to federal arbitration law, or as a condition precedent to or consideration for arbitration, subject to federal arbitration law or New York's substantive contract law. 613 F.2d at 472–3. Under either approach, the panel held, the injunction had been properly issued because the record amply supported the district court's "assessment of the equities". 613 F.2d at 473.

Our case differs from *Guiness-Harp,* because the district court below found an absence of equitable factors and, therefore, denied the requested injunction. While plaintiffs vigorously dispute this aspect of Judge Burns's decision, their primary argument is that these findings are inconsequential. It is their position that the district court should have enforced the status quo provision without regard to equitable factors, and it should have done so as an incident of its power under section 4 of the Federal Arbitration Act, 9 U.S.C. § 4 (1976).

We disagree. Whichever approach is taken to a status quo provision, a request to a district court for injunctive enforcement of the provision necessarily invokes consideration of the traditional factors governing injunctive relief. The *Guiness-Harp* panel strongly implied this view when it squarely rested its affirmance on the favorable balance of equities to plaintiff in that case. Nor is *Albatross S.S. Co. v. Manning Bros., Inc.,* 95 F.Supp. 459 (S.D.N.Y.1951), relied on by plaintiffs, to the contrary. Although the court there took the approach that power to enforce the status quo provision stemmed from the Federal Arbitration Act, an overriding equitable factor—the obvious need to preserve the subject matter of the arbitration—nevertheless provided ample traditional support for the injunction issued. Moreover, requiring equitable factors to support injunctive enforcement of commercial status quo provisions is consistent with those cases generally involving specific performance of agreements to arbitrate under section 4 of the Federal Arbitration Act, *see, e.g., Kulukundis Shipping Co. v. Amtorg Trading Corp.,* 126 F.2d 978, 987 (2d Cir.1942); *In re Utility Oil Corp.,* 10 F.Supp. 678, 680 (S.D.N.Y.1934), as well as with those cases involving enforcement of status quo provisions in labor arbitration agreements. *See, e.g., Boys Markets v. Retail Clerks Union,* 398 U.S. 235, 254, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199 (1970); *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18,* 471 F.2d 872, 875–78 (6th Cir.1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973).

We conclude, then, that to the extent that federal arbitration law applies, issuance of a status quo injunction pending commercial arbitration requires a demonstration of supporting equitable factors such as absence of an adequate remedy at law or a danger of irreparable harm. Since the standards for specific performance of a contract under Connecticut law are substantially similar, *see generally Burns v. Gould,* 172 Conn. 210, 214, 374 A.2d 193, 197 (1977), we need not decide now whether the present status quo provision is governed by federal or state law. Under either approach, plaintiffs' request for a status quo injunction was properly denied if they did not establish the necessary equitable prerequisites, to which we now turn, bearing in mind that in order to prevail plaintiffs must demonstrate that the district court abused its discretion in denying equitable relief. *United States v. W.T. Grant Co.,* 345 U.S. 629, 633–34, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *S.E.C. v. Bausch & Lomb,* 565 F.2d 8, 18–19 (2d Cir.1977); *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 405 (2d Cir.), *cert. denied,* 414 U.S. 924, 94 S.Ct. 234, 38 L.Ed.2d 158 (1973); *cf. Kaynard v. Mego Corp.,* 633 F.2d 1026, 1030 (2d Cir.1980) (abuse of discretion standard applicable where district court issued status quo injunction under section 10(j) of National Labor Relations Act).

Plaintiffs argue here, as they did below, that if ORRSI is permitted to stop paying for the interim services before completion of the arbitration proceedings, plaintiffs will suffer irreparable harm for which a retrospective award of money damages by the arbitrators would be an inadequate remedy. Plaintiffs submit that CRRA lacks both the power and the funds to subsidize the interim services and that the participating towns lack the expertise to operate the local transfer stations. Therefore, plaintiffs contend, once ORRSI ceases to provide the interim services, the towns presently participating in the system will be forced to make alternative arrangements for hauling and disposal of their solid wastes. As the towns withdraw from the system, plaintiffs

continue, CRRA's "good will" will be undermined, thereby making it difficult for CRRA to attract a sufficient number of towns to make the system workable if and when the interim services are restored or a fully functioning plant is installed. Furthermore, they contend, this loss of "good will" will disrupt CRRA's business prospects in the investment community and deter towns in other parts of Connecticut from entering into future regional compacts that CRRA might organize.

Judge Burns concluded that the evidence simply did not support the scenario envisioned by plaintiffs. Specifically, she found that plaintiffs' claim that they lacked an adequate legal remedy in the short-run was belied by the willingness of Compaction Systems to continue hauling and disposing of the towns' garbage, provided it was paid by someone, and by the fact that either CRRA or the towns could directly hire the relatively small number of employees needed at the mothballed plant and the five transfer stations.

With respect to plaintiffs' claims of long-run irreparable harm, Judge Burns further found that the reluctance of Connecticut towns to enlist in other CRRA projects would not be attributable to the termination of interim services in Fairfield County, but rather to CRRA's failure to complete its pilot project in Bridgeport. Judge Burns found that the Bridgeport project was "practically moribund", and that it was questionable whether it would ever be revived. Furthermore, Judge Burns found that even if towns currently participating in the project should "withdraw because of the termination of interim services and the Bridgeport plant ultimately becomes functional, it is probable that those same towns or a sufficient number of new towns would elect to enter the regional program."

Plaintiffs argue that Judge Burns misunderstood the significance of the problems that would be created if Occidental and its subsidiary were permitted to cease providing the interim services, and they request us to reweigh the evidence and draw different conclusions. Yet this court's scope of review is not unlimited. As the Supreme Court recently observed in *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982):

> In reviewing the factual findings of the District Court, the Court of Appeals was bound by the "clearly erroneous" standard of Rule 52(a), Federal Rules of Civil Procedure. That Rule recognizes and rests upon the unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and weigh the evidence. Because of the deference due the trial judge, unless an appellate court is left with the "definite and firm conviction that a mistake has been committed," it must accept the trial court's findings. (citations omitted).

Applying that standard to this case, we cannot say that the findings supporting Judge Burns's conclusions of no irreparable harm and an adequate remedy at law were clearly erroneous. To begin with, it is by no means clear that the participating towns can or will withdraw from the system if ORRSI ceases to pay for the interim hauling and disposal services that Compaction Systems is currently delivering. As the district court correctly noted, the towns' rights of termination are narrowly circumscribed by certain conditions precedent included in their contracts with CRRA. Among other things, section 801 of the Uniform Municipal Solid Waste Management Services Contract entered into between CRRA and each of the participating municipalities requires any municipality which seeks to withdraw from the system to (1) give 180 days' notice; (2) obtain the approval of a majority of the other participating municipalities; and (3) enact a resolution or ordinance authorizing withdrawal.

Moreover, even if the towns were to withdraw, we agree with the district court that it is "at best speculative" that CRRA would suffer irreparable harm. While there was some evidence that one of the seven towns presently receiving interim services was considering the possibility of entering into an alternative long-term ar-

rangement that would prevent it from returning to the system in the near future, none of the town officials who appeared at the hearing testified as to any definite plans to withdraw from the system. On the other hand, it was CRRA's own chairman who admitted on cross-examination that if towns withdrew and the Bridgeport plant subsequently became operational, those towns or others would "flock" to the system to be relieved of the burden of landfilling their wastes. *Cf. Carey v. Klutznick,* 637 F.2d 834, 837 (2d Cir.1980) ("[r]eal and imminent, not remote" harm required to justify equitable relief).

Nor are we troubled by the possible risk of injury to CRRA's reputation as the promoter of regional resource recovery systems throughout Connecticut. Here again, the record supports Judge Burns's conclusion that it is the failure to complete the Bridgeport plant rather than the threatened termination of interim services that would cause any difficulties CRRA might experience in organizing other regional compacts.

Plaintiffs argue, however, that the record was not fully developed, since on three occasions Judge Burns excluded proffered testimony which would have tended to establish that CRRA's ability to recruit towns for other projects would be impaired if Occidental were permitted to terminate the interim services. Yet this evidence would only have been cumulative, since Judge Burns had already heard testimony to the same effect, which she rejected in concluding that whatever "good will" CRRA had developed since its creation in 1973 had been dissipated by the time ORRSI first threatened to terminate the interim services. In these circumstances, we cannot say that Judge Burns abused her discretion in refusing to consider the additional testimony. *See DiMeo v. Minster Machine Co.,* 388 F.2d 18, 20 (2d Cir.1968); *Draddy v. Weston Trawling Co.,* 344 F.2d 945, 946–47 (2d Cir. 1965); *see also Collins v. Wayne Corp.,* 621 F.2d 777, 782–83 (5th Cir.1980).

Finally, there is no merit to plaintiffs' argument that interim injunctive relief is necessary to insure that the local transfer stations remain operational and that the mothballed Bridgeport plant be maintained. As the district court concluded, either CRRA or the towns could hire the personnel to perform these relatively simple tasks, perhaps even the same employees currently working for ORRSI. Indeed, this is precisely the course of action that ORRSI followed when it assumed CEA's functions under the contract in 1980.

█ On the basis of these findings of fact, which are not clearly erroneous, it is clear that the denial of injunctive relief below was not an abuse of discretion. The only realistic injury confronting plaintiffs is economic. If Occidental follows through with its threat to cease paying for the hauling and disposal services, plaintiffs, either individually or collectively, will be forced to make other arrangements. Regardless of what arrangements are made, the amount of garbage hauled and the funds expended for it would be readily ascertainable. Similarly, any wages paid in connection with maintaining the plant and operating the transfer stations would be easily calculable, as would any incidental expenses. Thus, to the extent that the arbitrators may eventually determine that plaintiffs are entitled to recover any or all of these costs, money damages would provide a full and adequate remedy.

On the other hand, accepting CRRA's representations with respect to its own fiscal limitations at face value provides another reason for withholding equitable relief. Continuing to provide the interim services until the arbitration proceedings are resolved would require defendants to sustain losses in excess of $100,000 per month for an indeterminate period that CRRA's own chairman estimated could span years, without any assurance that if ultimately successful defendants would be able to recoup these losses from plaintiffs. In the absence of any substantial equitable factors weighing in plaintiffs' favor, the district court was well within its discretion in declining to thrust defendants into this predicament.

The order appealed from is therefore affirmed, and, following the reasoning of the

district court as to the need for a brief transitional period, we vacate the injunction pending appeal heretofore granted by this court as of 14 days from the date of this decision.