### LITHO PRESTIGE, DIVISION of UNIMEDIA GROUP, INC., Petitioner,

v.

### NEWS AMERICA PUBLISHING, INC. and New York Magazine Company, Inc., Respondents.

### No. 86 Civ. 6440 (JMW).

United States District Court, S.D. New York.

Sept. 3, 1986.

---

Floyd Abrams, Cahill, Gordon & Reindel, New York City, for petitioner.

Howard Squadron, Squadron, Ellenoff, Plesent & Lehrer, New York City, for respondents.

### MEMORANDUM AND ORDER

WALKER, District Judge:

This case presents the question whether the publisher of *New York Magazine* ("*New York*"), dissatisfied with the quality performance of its printer twenty months into a five year printing agreement containing an arbitration clause, may terminate its contract, switch printers, go to arbitration and, if found at fault, respond in damages. Plaintiff Unimedia Group, Inc. ("Unimedia"), on behalf of its printing division located in Drummondville, Quebec, Litho Prestige ("Litho") has brought this action seeking a preliminary injunction to restrain News America Publishing Inc. ("News America") from terminating the agreement pending a resolution of their dispute in arbitration which both sides have demanded.

On August 22, 1986, this Court entered an order for a temporary restraining order expressly noting that the decision was reached "in the context of the temporary restraint sought, to stay the termination for one week. Thus, the Court's determi-

nation is without prejudice to any judicial conclusion that no restraint would be appropriate in the context of a application for a preliminary injunction that could last many months and create an entirely different equation of hardships."

For the reasons discussed below, the Court now denies Unimedia's motion for a preliminary injunction pending arbitration.

### Factual Background

The Court has received extensive factual submissions from both sides. It has carefully read, word-by-word and line-by-line, all of the exhibits, the several affidavits, the deposition transcripts, and the transcripts of two days of hearings at which the Court was able to assess the demeanor of the principal witnesses. The Court finds the following facts.

By 1983, *New York Magazine*, in its fifteenth year since its founding in 1968, was enjoying advertising revenues of $25,000,-000 as its advertisers sought to reach its affluent market of sophisticated metropolitan readers. Its printing contract was coming to a close. In anticipation of this event, Litho undertook and was able to attract for itself this important printing business. As part of its move, Litho acquired a new press for $16 million that could, it believed, satisfy *New York's* requirements and promised to News America's predecessor corporation that it would be Litho's "number one customer". In order to arrange $18 million in financing for the acquisition of the press and other necessary plant expansion occasioned by the increase in business, Litho obtained the necessary bank financing supplemented by subsidies from the governments of Canada and Quebec of about $4 million and $1 million, respectively, in anticipation of an increase in exports and domestic employment.

On November 18, 1983, Litho and News America's predecessor executed the printing agreement. The lengthy agreement "for the complete manufacture of the weekly *New York Magazine*" covered an initial five year term. It provided for re-newal at the end of five years on January 29, 1990 unless "either party shall on or before September 1, 1989, notify the other of the intent not to so extend" (Art. XIII, ¶ 13.01). The agreement also provided that the printer could terminate upon six months notice after a change in the U.S. dollar/Canadian dollar exchange rate specified therein (Art. VI, ¶ 6.05) and that the publisher could terminate the contract upon the occurrence of two events: (1) discontinuance of its publication of New York Magazine or (2) circulation losses giving rise to an inability to sustain the minimum print order required by the agreement. That neither of these two events has occurred is not disputed.

The agreement in Article IV, ¶ 14.01 provided that "[a]ny controversy of [sic] claim arising out of or relating to this contract, or breach thereof, shall be settled by arbitration" in New York under the rules of the American Arbitration Association and "judgment upon the award rendered by the Arbitration(s) may be entered in any court having jurisdiction thereof."

Regarding Litho's performance under the agreement, the agreement spelled out Litho's warranties and limitations on liability in Article VII, ¶ 701 and 702. Litho warranted that "all WORK to be performed by it shall be done in a good and workmanlike manner consistent with the quality of WORK performed by Arcata [the predecessor printer for *New York Magazine*] ... and consistent with the manufacturing process and the materials being used". The agreement required that defendant notify Litho of any breach of warranty within thirty days, failing which all work "shall be conclusively presumed to comply with all warranties of Litho Prestige". In the following provision, headed "Limitations", Litho's liability for breach of warranty was generally limited to direct out-of-pocket losses. The provision further provided that in the event of a breach there was no liability for other direct, indirect or consequential damages except upon a finding of "Litho Prestige's gross negligence, deliberate, willful or bad faith refusal to

perform its obligations under this agreement."

This Court will not dwell at great length on the problems encountered by the parties in the twenty months they have been operating under the contract. Their nature and the effect to be accorded these issues are properly the subject of the mutually-sought arbitration. It will suffice here to point out News America's claim that Litho's performance was substandard from the outset. News America asserts that its termination of the Litho contract is fully justified; that initial problems with binding were superceded by late deliveries and by repeatedly defective printing: first in editorial copy and later in advertising reproductions, particularly in color prints; that poor reproductions of advertising required the magazine to run free advertising to compensate for defective ads, or "make goods", at a rate three times greater than with its prior printer and that, as a result of these poor reproductions, advertisers were beginning to defect. Litho, while admitting to some deficiencies in reproductions, denies that the situation is as grave as News America portrays, and claims responsibility for most defects lies with the publisher, who approved the printing work based on copy it submitted. Litho maintains that termination by News America is not justified and is a breach of the agreement.

While it is not for this Court to venture into the domain of the arbitration panel, which will have the task of deciding the contract issues and any blame therefor, the Court did hear credible testimony that such advertising reproduction deficiencies did exist, had resulted in numerous "make goods" and had resulted in a decision by two advertisers to cease doing business and by others to closely monitor future issues for improvements before finally deciding whether to continue advertising in *New York Magazine.*

From May to early August 1986, the management of News America held a series of internal meetings to discuss the printing situation. These led to a decision by News America to terminate the agreement with Litho, and on August 6, 1986, News America's President Martin Sugarman advised Litho's President Eric Ferrat that the agreement would be terminated after the printing of the New York Magazine issue dated September 1, 1986. News America offered to "buy out" the contract for $2 million.

On August 15, 1986, both parties demanded arbitration, and on August 19, 1986, Unimedia commenced this action before this Court.

## DISCUSSION

The Second Circuit has stated that a preliminary injunction must issue where plaintiffs show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.,* 749 F.2d 124, 125 (2d Cir.1984); *Jackson-Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979).

### Irreparable Harm

■ In the first place, it is not seriously contended that the loss of the *New York Magazine* printing business will threaten the ability of plaintiff to continue in business or even seriously cripple it. The $6.5 million (Canadian) plaintiff earned from the *New York Magazine* in 1985 represented less than 4% of plaintiff's total revenues of $179 million (Canadian). Yet, cases finding the irreparable injury which forms a necessary predicate for injunctive relief pending arbitration typically involve situations where "defendant's proposed termination of plaintiff's [contract] is likely to cause the plaintiff's business to fold." *Newport Tire & Rubber Co. v. Tire & Battery Corp.,* 504 F.Supp. 143, 150 (E.D.N.Y.1980). For example, in *Roso-Lino Distributors, Inc. v. Coca-Cola Bottling Company of New York,* 749 F.2d 124, 126 (2d Cir.1984) the Second Circuit granted an injunction

prior to arbitration, explicitly noting that plaintiffs would "stand to lose their business forever" if the court had refused to enjoin the defendant from terminating its distributorship contract. *See also Janmort Leasing, Inc. v. Econo-Car International, Inc.*, 475 F.Supp. 1282, 1294 (E.D.N.Y.1979) (granting injunction where termination of franchise contract would result in "the loss or destruction of a going business....").

Similarly, in the recently decided *Givenchy, S.A. v. William Stuart Industries*, No. 85–9911, slip. op. (S.D.N.Y. March 10, 1986) [Available on WESTLAW, DCTU database], a federal district court granted a preliminary injunction pending arbitration after finding that "[d]efendant's business, built around its relationship with Givenchy, will likely be destroyed if the 1982 Agreement is terminated.... [Defendant] W.S.I. would be financially crippled if [plaintiff] Givenchy is allowed to persist in its position that defendant's rights under the 1982 License Agreement have been terminated." *Id.* at 7. The *New York Magazine* agreement did not become effective until 1985, six years after Litho Prestige was formed as a subdivision of plaintiff. Thus, in no sense did the media conglomerate "build its business" around the New York Magazine contract with defendant. Furthermore, the argument that a four percent business loss will "financially cripple" plaintiff is wholly unpersuasive.

Faced with the difficulty of proving irreparable harm directly flowing from the termination of the agreement, plaintiff relies upon asserted consequencies that are less direct. Plaintiff argues that while it nominally contracted with defendant, in reality plaintiff was involved in a five-way agreement not only between the two co-signitories, but also involving the Royal Bank of Canada and the governments of Canada and Quebec, who jointly financed Litho's plant expansion related to the *New York Magazine* printing assignment upon the understanding that the contract would last five years. Plaintiff asserts that a termination one-third of the way into the contract's five year term will impair its reputa-

tion with these entities. Such harm is highly speculative. There is no evidence that either the Quebec or Canadian government will refuse plaintiff subsidies in the future. At a recent meeting between plaintiff's president and the Royal Bank, there was no hint that plaintiff's twenty year banking relationship was even remotely in jeopardy. Moreover, to the extent reputational injury can be shown, it is compensable in money damages. *Jack Kahn Music Co., Inc. v. Baldwin Piano and Organ Co.*, 604 F.2d 755, 761–63 (2d Cir.1979).

Plaintiff next claims that it must layoff between 125 and 150 of its 400 Litho division employees if defendant terminates the contract, that workers will leave Drummondville and that if specific performance is ultimately ordered in arbitration, plaintiff will need to recruit and train new workers. First, the Court notes that the parties have contested whether the contract termination will require substantial layoffs, with defendant asserting that plaintiff may retain almost all of its employees by rescheduling hours and undertaking other adjustments. The Court also notes plaintiff's admission that under Quebec law the Litho division cannot drop a single employee from its payroll for three months. During this three month period, plaintiff may well develop new business which will require the efforts of workers previously involved in the publication of New York magazine. "Real and imminent, not remote, irreparable harm is what must be demonstrated...." *Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir.1980); *accord Jack Kahn Music Co., Inc. v. Baldwin Piano and Organ Co.*, 604 F.2d 755, 759 (2d Cir.1979).

However, even if termination of the *New York Magazine* contract would require immediate, wholesale layoffs, plaintiff has failed to show that severance payments and any costs relating to finding and training new employees in the future cannot be reduced to money damages. Plaintiff thus mischaracterizes the costs involved in replacing employees as irreparable harm. *See Clune v. Publishers' Association of*

*New York City*, 214 F.Supp. 520, 531 (S.D. N.Y.1963), *aff'd*, 314 F.2d 343 (2d Cir.1963).

■ Plaintiff's argument that termination will cause plaintiff to lose at least one nearly finalized contract also lacks merit. Plaintiff has not described the allegedly impacted negotiations in anything but the most vague and unspecified terms. This discription is not assisted by a letter from the other party to this proposed contract, produced at a deposition, which is inconclusive as to the degree of that party's interest in buying plaintiffs services. Conclusory statements of loss represent an insufficient basis for a finding of irreparable harm. *Connecticut Resources Recovery Authority v. Occidental Petroleum Corp.*, 705 F.2d 31, 37 (2d Cir.1983). Growing businesses frequently engage in negotiating new contracts. As a practical matter, businessmen cannot turn to the courts for injunctive relief whenever some event threatens a future business relationship which may occur only after years of negotiations, if at all.

Plaintiff's failure to establish irreparable harm is of itself sufficient to preclude the preliminary injunction requested. However, this Court also finds that plaintiff has not fulfilled the additional requirements for a preliminary injunction.

### Plaintiff's Likelihood of Success on the Merits

A party proving irreparable injury may receive a preliminary injunction if that party also shows a likelihood of success on their merits. In this case, "success on the merits" necessarily equates with specific performance, since that is the basis on which the plaintiff argues the necessity of a preliminary injunction to preserve the status quo pending arbitration.

■ This Court addresses the likelihood of plaintiff's receiving a specific performance remedy with some reluctance, since the parties have agreed that arbitration is the proper forum for a decision on all issues of contract liability. Consequently, this opinion should not be read to prevent an arbitration panel from awarding any appropriate remedy, including specific performance. Nonetheless, the Court holds that plaintiff has failed to show a likelihood of receiving specific performance.

■ "Before specific performance may ordered, remedies at law first should be determined to be incomplete and inadequate to accomplish substantial justice." *Leasco Corporation v. Taussig*, 473 F.2d 777 (2d Cir.1972); *accord Pecorella v. Greater Buffalo Press, Inc.*, 107 A.D.2d 1064, 486 N.Y.S.2d 562 (4th Dep't 1985). The specific performance remedy thus remains largely limited to contracts where the traditional remedy of damages is inappropriate because the unusual goods or services involved are difficult to value. *See Fast v. Southern Offshore Yachts*, 587 F.Supp. 1354 (D.Conn.1984) (purchaser of customized yacht entitled to specific performance); *Colorado-Ute Electric Association, Inc. v. Envirotech Corp.*, 524 F.Supp. 1152 (D.Colo.1981) (purchaser of complex air pollution control equipment entitled to specific performance).

As discussed above, plaintiff must produce significant evidence indicating that the *New York Magazine* contract involves unique elements which may prove difficult to value. The principal injury plaintiff will suffer if defendant terminates the contract—loss of defendant's contract payments for printing services—may be calculated to the last cent. Plaintiff also should have little difficulty calculating its costs in finding and training new workers to replace the workers who will lose their jobs if defendant terminates. Defendant's termination may result in some costs which are difficult to quantify—such as the cost of changing production processes to accommodate new clients who will presumably replace defendant—but such costs may arise in any case where one party terminates a contract.

The embodiment of an intricate relationship between plaintiff and defendant in the New York Magazine contract also militates against specific performance. Where a contract governs such an ongoing relation-

810

ship, "a grant of specific performance could require the courts to supervise the ... relationship over the length of plaintiffs' lifetime, a task for which courts are poorly suited." *Heheman v. E.W. Scripps Co.,* 661 F.2d 1115, 1125 (6th Cir.1981) (refusing specific performance of labor contract), *reh'g denied,* 668 F.2d 878 (6th Cir. 1982), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). *See also Infusaid Corp. v. Intermedics Infusaid, Inc.,* 739 F.2d 661, 669 (1st Cir.1984) ("there is a strong presumption against specific performance of a joint venture or partnership agreement"). Given the numerous subjects of controversy which emerged during the proceedings on this motion and the temporary restraining order, supervising the relationship formulated in the printing contract while the parties await an arbitration decision would indeed represent a difficult task.

Plaintiff attempts to bolster its specific performance argument by asserting that contract provisions limiting defendant's remedies, where plaintiff performs substandard printing work, somehow foreclose defendant's termination of the printing contract. However, the most that can be said for these provisions is that, before the arbitration panel, they may undercut defendant's argument that its termination was justified. There is nothing in these provisions that prohibits termination amounting to a breach for which defendant may have to respond in money damages. Thus, even if the defendant's conduct is wrongful and an appropriate basis for liability, plaintiff must still prove the inadequacy of a damage remedy in order to obtain specific performance. As discussed above, plaintiff has pointed to no contract provision indicating, explicitly or implicitly, that a damage remedy would prove inadequate in this case. To the contrary, all evidence indicates that money damages will prove sufficient to compensate plaintiff.

The Court thus finds that plaintiff is unlikely to succeed on the merits.

*Balance of Hardships*

■ Where a plaintiff has shown irreparable harm but has failed to show a likelihood of success on the merits, the plaintiff may nonetheless obtain a preliminary injunction if he shows "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Given the Court's conclusion as to the unlikelihood of an award of specific performance, the Court doubts whether plaintiff has in fact presented serious questions going to the merits. However, apart from plaintiff's specific performance claim, the Court finds that plaintiff fails to meet this part of the test for specific performance because the "balance of hardships" in fact favors defendant rather than plaintiff. In other words, the Court concludes that defendant would suffer greater hardship if the Court granted plaintiff's motion for a preliminary injunction than plaintiff would suffer if the Court denied this motion.

While plaintiff has largely failed to show significant hardships resulting from the termination of the New York Magazine contract, defendant has demonstrated considerable hardship if this Court enjoins defendant from terminating the contract. Defendant has produced significant evidence that it has lost and is likely to continue to lose advertisers if plaintiff were to continue as the printer of *New York Magazine.* If this Court granted a preliminary injunction which proscribed defendant's termination during arbitration proceedings, defendant would have little leverage to take significant steps correcting perceived quality problems, and plaintiff would have little incentive to improve the quality of its work.

Courts in this circuit have granted injunctive relief pending arbitration only where the balance of hardships tips much more decidedly in plaintiff's favor than in the instant case. For example, many of the Second Circuit cases granting injunctions pending arbitration have enjoined a manufacturer from terminating the supply

of a product to a distributor. These cases have noted explicitly that an injunction would produce little hardship for the defendant, who is required only to earmark a small portion of his product for delivery to the plaintiff during the period covered by the injunction. *See Roso-Lino Distributors, Inc. v. Coca-Cola Bottling Company,* 749 F.2d 124, 126 (2d Cir.1984); *Janmort Leasing, Inc. v. Econo-Car International, Inc.,* 475 F.Supp. 1282, 1296 (E.D.N.Y.1979) ("Most notably, defendants' voluminous papers are entirely devoid of even the barest suggestion that ECI [defendant] ... will be prejudiced, let alone reduced to hardship....").

The hardship faced by defendant in the instant case appears far more substantial. An injunction here would not have the effect of assigning a small number of defendant's magazines to a particular source, but instead would dictate the *method of production* defendant must employ for every copy of New York Magazine published over many months. Such an injunction would prevent defendant from taking serious action to improve its final product—a product which defendant currently views as substandard.

Plaintiff's reliance on *Albatross S.S. Co. v. Manning Bros, Inc.,* 95 F.Supp. 459 (S.D.N.Y.1951) appears misplaced. In that case, Judge Weinfeld explicitly noted that the party opposing a motion for a preliminary injunction made little showing of hardship, writing: "The owner [respondent] makes no claim of any conduct on the part of the charterer [petitioner] of a breach of the provisions of the charter. ..." *Id.* at 464. *Albatross* is also distinguishable because of the very short preliminary injunction ordered by the Court, which noted that "arbitration can be had and disposed of in a matter of days." *Id.* at 464. Given the more deliberate progress of arbitration today, a preliminary injunction would force defendant to remain in this contract for a much longer period of time, magnifying any hardship defendant currently suffers under the contract.

The Court thus finds that plaintiff has failed to prove that the balance of hardships favors the grant of a preliminary injunction.

### Effect of Termination Clauses in the Agreement

■ Plaintiff asserts that a preliminary injunction is appropriate in the instant case because defendant's plan to end its relationship with plaintiff directly contravenes the clause in the printing agreement limiting defendant's right to terminate. Plaintiff's argument is not compelling.

To hold that defendant could not withdraw from this relationship because such conduct would breach the termination clause would be contrary to the rule in this circuit requiring that an arbitrator decide all breach of contract questions where the contract contains a broad arbitration clause. *McAllister Brothers v. A & S Transportation Co.,* 621 F.2d 519, 522 (2d Cir.1980) ("If the arbitration clause is broad and arguable covers disputes concerning contract termination, arbitration should be compelled. ..."). In *Rochdale Village, Inc. v. Public Service Employees Union,* 605 F.2d 1290, 1295 (2d Cir.1979), the Court of Appeals held that an arbitrator should resolve questions involving breach of a termination clause where a contract provides for arbitration of "any and all disputes." Under *Rochdale,* the arbitration clause in the instant contract, which specifies arbitration of "[a]ny controversy of claim arising out of or relating to this contract," mandates that an arbitrator, rather than this Court, decide whether defendant's proposed change of printers would violate the termination clause.

■ However, even if this Court were to find that defendant's proposed withdrawal would breach the termination clause, plaintiff has failed to demonstrate that injunctive relief is necessary, since an arbitrator may award damages to compensate plaintiff. As with any other contract claim, the victim of a termination clause breach may receive injunctive relief only where money damages would provide an inadequate rem-

**812**

edy. Accordingly, although one decision in this district granted injunctive relief prior to an arbitration decision on wrongful termination, the Court issued an injunction only after finding that termination by defendant would cause plaintiff irreparable harm. *Cott Beverages Distributors of Westchester, Inc. v. Cott Corp.,* 80–346, slip op. (S.D.N.Y. Feb. 1, 1980) (enjoining termination of distributorship where sales of defendant's products represented 72 percent of plaintiff's business). As discussed above, plaintiff has failed to show any such irreparable harm in the instant case.

### Conclusion

The motion for a preliminary injunction is denied. Plaintiff has indicated an intention to appeal an adverse decision. Accordingly, the effect of this decision dissolving the previously entered temporary restraint is stayed until 5:00 P.M., September 5, 1986. This stay will preserve plaintiff's rights to pursue his appellate remedies.

SO ORDERED.