AMTOTE INTERNATIONAL, INC., Plaintiff,

v.

PNGI CHARLES TOWN GAMING LIM-ITED LIABILITY COMPANY, and Penn National Gaming, Inc., Defendants.

No. CIV.A. 3:97–CV–146.

United States District Court, N.D. West Virginia.

Feb. 20, 1998.

Richard L. Douglas, Gerard J. Gaeng, Martinsburg, Baltimore, MD, for plaintiff.

Benjamin L. Bailey, Charleston, WV, for defendants.

## MEMORANDUM OPINION AND ORDER

BROADWATER, District Judge.

This matter comes before the Court for consideration of the plaintiff's motion for preliminary injunction. For reasons set forth below, the Court denies this motion.

## I. PROCEDURAL HISTORY

Plaintiff Amtote International, Inc., ("Amtote") filed a complaint along with a motion for a temporary restraining order on December 17, 1997. After the Court gave notice to the defendants, PNGI Charles Town Gaming Limited Liability Company ("PNGI") and Penn National Gaming, Inc. ("Penn National"), the Court conducted a hearing on this motion by telephone conference on December 23, 1997. In addition to counsels' oral argument, the Court considered the parties' memoranda on this issue.

As a result of the hearing, the Court issued a temporary restraining order on December 24, 1997. This order set the matter for an evidentiary hearing on January 14, 1998, to determine whether a preliminary injunction should be issued.

The hearing was held on January 14, 1998 as scheduled. Both Amtote and Penn National presented witnesses and introduced exhibits in support of their respective positions. At the conclusion of the hearing, the Court directed both counsel to file memoranda concerning the legal matters pertinent to a preliminary injunction. In particular, the Court directed the parties to focus on the issues of irreparable harm and specific performance. Counsel complied and submitted the matter for a decision.

## II. STATEMENT OF FACTS

This civil case involves the interaction of several contracts entered into by Amtote with Charles Town Races, Inc., ("CTR") and Charles Town Racing Limited Partnership ("CTRLP"). CTR and CTRLP were the prior owners and operators of the Charles Town Race Track located in Charles Town, Jefferson County, West Virginia. The first contract was the Wagering Services Agreement, dated September 9, 1994, which concerned horse race wagering systems operations. The second contract was the Binding Agreement, dated October 20, 1994, concerning video slot terminal systems. The third contract was the Amendment to the Binding Agreement, dated January 1, 1995. The fourth contract was the Amendment to the Wagering Services Agreement, dated February 1, 1995. Although bearing different dates, both of the amendment contracts were signed later in March 1995. The fifth contract was the Assignment and Assumption Agreement, dated February 22, 1996, between Amtote and GTECH Corporation (GTECH), at one time the owner of Amtote.

Amtote is a Delaware corporation with its principal place of business in Hunt Valley, Maryland. PNGI is a West Virginia limited liability company with its principal business being the Charles Town Race Track in Charles Town. Penn National is a Pennsylvania corporation with its principal place of business in Wyomissing, Pennsylvania. Penn National is the majority owner of PNGI.

On January 15, 1997, PNGI purchased the Charles Town Race Track from CTR and CTRLP. PNGI conducts horse racing with facilities for pari-mutual wagering at the Charles Town Race Track. As well, PNGI started operating State government approved video slots terminal gaming systems in September 1997.

For many years, Amtote has been the exclusive provider of pari-mutual wagering services at Charles Town Race Track. Amtote and CTR, the prior owner of the race track, entered into the Wagering Services Agreement on September 9, 1994. By the Wagering Services Agreement, Amtote obtained the right to continue as the exclusive provider of pari-mutual wagering services at the Charles Town Race Track until December 31, 1996. Amtote's compensation for its services was to be determined according to a schedule contained in the Wagering Services Agreement. This base compensation was to be computed by multiplying the total daily wagers ("handle") by 0.005 (or 0.5%).

At the time of the Wagering Services Agreement, Amtote was a wholly-owned subsidiary of GTECH. When State government approved the use of video slots terminal gaming in West Virginia, Amtote and CTR entered into another contract on October 20, 1994, the Binding Agreement. By this contract, Amtote paid CTR $50,000 and provided a loan of $750,000 for the right to provide a video lottery terminal system at Charles Town Race Track. Paragraph 17(a) of this

contract permitted Amtote to assign any or all of the Binding Agreement to the parent or subsidiary of Amtote.

Paragraph 5 of the Binding Agreement set forth the following as to the contract terms:

*Term of the Agreements*

The combined initial term of this Binding Agreement and the Gaming Services Agreement will be for a period of seven (7) years from the installation and initial operation of the video lottery system, subject to the Buy-out Option (the "Term"). The parties presently expect the installation and initial operation of the video lottery system in at least four (4) months after the approval of the Referendum and all necessary governmental approval and actions allowing the operation of a video lottery system at Charles Town. The term of the Wagering Services Agreement shall expire on the later of (a) 31 December 1996, or (b) the expiration or earlier termination of the Term.

In November 1994, the voters of Jefferson County, West Virginia rejected the local referendum authorizing video slots terminal gaming. This prevented Amtote from becoming the exclusive provider of video slots terminals to Charles Town Race Track. For financial reasons, CTR stopped horse racing at Charles Town and tried to sell the track. Thereafter, Amtote and CTR entered into negotiations concerning amendments to the Wagering Services Agreement and the Binding Agreement.

As previously stated, the amendments would bear different dates, but they were signed and returned by CTR to Amtote on March 16, 1995. The Amendment to the Binding Agreement was dated January 1, 1995. Amtote and CTR agreed that the Binding Agreement would be enforced against any buyer of the race track. As to contract terms, the Amendment to the Binding Agreement states in paragraph 6 as follows:

The Wagering Services Agreement and Binding Agreement, as amended, will expire on 31 December 1997, provided that on or prior to such date (i) the Referendum has not been approved and (ii) the Loan has been repaid in full. If the Referendum has been approved, then the Wagering Services Agreement and Binding Agreement remain in effect pursuant to their respective terms. If the Referendum has not been approved and the Loan has not been repaid in full, then the Wagering Services Agreement and Binding Agreement shall remain in full force and effect until such time as the Loan has been repaid in full.

The Amendment to the Wagering Services Agreement was dated February 1, 1995. Amtote and CTR agreed that the Wagering Services Agreement would continue until December 31, 1997. As to contract term, the Amendment to the Wagering Services Agreement states in paragraph 2 as follows:

Exhibit B.3. is hereby deleted in its entirety and the following is substituted in lieu thereof.

This Agreement shall be in full force and effect for the period as of the date hereof and for a period of approximately three (3) Operating Years, beginning on or about 10 February 1995 and continuing until its termination at the close of business on 31 December 1997.

During this period of negotiations, GTECH was in the process of divesting itself of its wholly-owned subsidiary, Amtote. Mudge Acquisition Group and GTECH entered into a Purchase and Sale Agreement for Amtote on February 20, 1996. The effective date of this transaction has not been determined. GTECH and Amtote entered into the Assignment and Assumption Agreement, dated February 22, 1996. This agreement intended to convey the right to provide video lottery terminals via the Binding Agreement from Amtote to GTECH.

Subsequently, Penn National and CTR entered into negotiations for the sale and purchase of the Charles Town Race Track. Penn National helped fund a new election campaign to approve local video slots gaming. On November 5, 1996, the voters of Jefferson County approved a new referendum approving video slot gaming. During the negotiations for the sale of the race track, GTECH filed a civil action against

Penn National, PNGI, CTR and CTRLP to enforce the Binding Agreement and the Amendment to Binding Agreement. *GTECH Corporation v. Charles Town Races, Inc., et al.,* Civil Action No. 3:96–CV–72, (N.D.W.V. filed December 11, 1996). Although a preliminary injunction was entered in that case on May 23, 1997, the action was dismissed upon a settlement reached by the parties. *Id.,* Order entered July 17, 1997 (Document Number 81). GTECH then provided the video slots terminal systems to Charles Town Race Track. PNGI started operating video slot gaming for the public on September 15, 1997.

During the GTECH and Penn National litigation in 1997, Edward T. Mudge, IV, the President of Amtote contacted Penn National concerning the possible reopening of the Charles Town Race Track. Mr. Mudge wanted to negotiate a new agreement with Penn National and PNGI if the race track resumed operations.

Mr. Mudge wrote to PNGI by letter dated July 31, 1997, concerning the tote contract. Penn National wanted to consolidate the horse wagering tote services at its three race tracks and started talking with the three major providers of tote services during the summer of 1997. When the video slots terminals began operation in September 1997, the issue of the term of the Wagering Services Agreement arose. By a voice mail message left for William J. Bork, the Penn National President, on September 12, 1997, Mr. Mudge said he was interested in bidding for the new three-track tote contract and said that Amtote did not sue its customers. Mr. Bork testified that he did not want Amtote to bid on three-track tote contract if a seven (7) year term would be asserted. Mr. Bork assumed that September 12, 1997 call meant Amtote would not sue. Amtote's bid by letter dated October 14, 1997, referred in a footnote that the bid was not to be construed a waiver of the seven (7) year term.

After Penn National awarded the tote services contract to Autotote, Amtote took exception. Correspondence ensued reflecting the parties' arguments concerning the term of the Wagering Services Agreement. Penn National maintains it ended on December 31, 1997. Amtote maintains that GTECH's installation of the video slots terminals and PNGI's operation of them starting in September 1997 extended the contract for seven (7) years per the Amendment to Binding Agreement.

In addition to fleshing out the facts, the testimony of the parties' witnesses also brought tote services into focus. The three major providers of tote services for placing wagers on horse races in the United States are Amtote, Autotote and United. Of the 223 tracks in the United States, Amtote approximately has tote contracts with 70 tracks (30%), Autotote has 110 tracks (50%), and United has 53 tracks (20%). Of Amtote's 425 employees, only 5 work at the Charles Town Race Track. Of the approximate one billion dollars in wagers handled by Amtote at its contracted tracks each year, the revenue that Charles Town produces for Autotote is only 0.85% of its yearly total. As well, only 90 of Amtote's 13,000 tote machines are located at Charles Town Race Track. Amtote also stated that the $500,000 due to PNGI per paragraph 9 of the Binding Agreement has not been paid, but asserts that this obligation was assigned to GTECH.

## III. *DISCUSSION OF LAW*

A preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Medical Corp.* 952 F.2d 802, 811 (4th Cir.1991), citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 799 (3rd Cir.1989): *Wetzel v. Edwards,* 635 F.2d 283 (4th Cir.1980); and *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189 (4th Cir.1977). The district court is cautioned to issue preliminary injunctions sparingly. *Wetzel.* 635 F.2d at 266.

"The Fourth Circuit follows the 'hardship balancing test,' whereby the court balances 'the harm or injury imposed on the plaintiff in the event relief is denied against the harm to the defendant if the relief is granted, and on the basis of such balancing

proceeds to determine the degree by which a 'likelihood of success' on the merits must be established before relief may issue." *Id.* (citing *Direx Israel Ltd. v. Breakthrough Medical Corp.* 952 F.2d 802, 811 (4th Cir.1991)). Under this test, four factors must be considered:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest.

*Id.* (citations omitted).

■ It is well settled that "[t]he basis of injunctive relief in the federal court has always been irreparable harm and the inadequacy of legal remedies." *Direx Israel Ltd.*, 952 F.2d at 812. In addition, "the required irreparable harm must be neither remote nor speculative, but actual and imminent." *Id.* (citation omitted). Moreover, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Hughes Network Systems, Inc. v. InterDigital Com. Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (citation omitted). Indeed, "[w]here the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Id.* (citations omitted).

The most important factor for the Court in this analysis is the irreparable harm to the plaintiff Amtote and the potential harm to the defendant Penn National. *Rum Creek Coal Sales, Inc., v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991). In *Rum Creek*, the Fourth Circuit set forth the analysis to be applied when considering a preliminary injunction motion:

> If after balancing those two factors [harm to plaintiff v. harm to defendant], the balance "tips decidedly" in favor of the plaintiff ... [citations omitted] a preliminary injunction will be granted if "the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." [citations omitted.] As the balance tips away from the plaintiff, a stronger showing on the merits is required.

*Id.*, 926 F.2d at 359.

Amtote has the burden of proving a "clear showing of immediate irreparable harm" that is both "actual" and "immediate", *Dan River, Inc. v. Icahn*, 701 F.2d 278, 284 (4th Cir. 1983), and not merely remote or speculative. *Brown v. Giuliani*, 158 F.R.D. 251, 264 (E.D.N.Y.1994). As well, the injury must be such that it cannot be fully remedied by an award of monetary damages. *Id.* at 264.

■ In *Litho Prestige v. News America Publishing, Inc.*, 652 F.Supp. 804 (S.D.N.Y. 1986), the district court found that losses from a contract that produced 4% of the printer's revenue as well as loss of reputation and loss of trained employees were all compensable in money damages. Here, the Charles Town contract represented less than one percent of Amtote's overall revenue in 1996. Also, the amount that Amtote may loose can be ascertained by multiplying the service fee times the total amount of wagers. This supports a denial of preliminary injunctive relief. Where damages are monetary and calculable, a party cannot obtain injunctive relief absent extraordinary circumstances. *Wisconsin Gas Co. v. Federal Energy Regulatory Comm.*, 758 F.2d 669, 674, (C.A.D.C.1985). Such extraordinary circumstances have been found to exist if the denial of injunctive relief would likely cause the business to collapse. *Wisconsin Gas Co.*, 758 F.2d at 674. This is not the situation before this Court.

■ In reference to the testimony of Mr. Bork and Phillip O'Hara, PNGI general manager, Penn National may potentially lose $450,000 per year if the injunction is granted. This is in contrast to the approximate profits of $50,000 to $100,000 that Amtote would lose based upon a tote fee of 0.033% of a $50,000,-000 handle. Using the *Blackwelder* balancing test, the greater potential harm appears to be that to the defendant Penn National. *Blackwelder*, 550 F.2d at 193.

As well, a more in depth review by the Court of the five major contracts involved in this case does not clearly reveal that the plaintiff will likely prevail on the merits. The testimony of several witnesses indicated that CTR's intention in entering the Binding Agreement was to have one party as the sole provider of both tote and video slot services, as supported by the language in the contracts. As well, the effect of the Assignment and Assumption Agreement between GTECH and Amtote as to both amendment agreements has not been fully resolved. Therefore, a issue now exists as to whether the specific performance mentioned in the Wagering Services Agreement is enforceable. Additional questions have also been raised as to the requirement that Amtote pay $500,000 to Penn National pursuant to paragraph nine (9) of the Binding Agreement. By Paragraph 1 and 2 of the Assignment and Assumption Agreement, Amtote may have assigned its rights to be the exclusive provider of pari-mutual services when it assigned paragraph 8 of the Binding Agreement.

 The questions of enforceability of these contracts also raise questions as to the use of specific performance. "The remedy of specific performance of a contract is not a matter of right in either party, but rests in the sound discretion of the Court, to be determined from all the facts and circumstances of the case." *Brand, v. Lowther*, 168 W.Va. at 726, 285 S.E.2d 474 (1981) (citations omitted) (no specific performance provisions in contract). Under West Virginia law, plaintiff cannot seek specific performance if it has an adequate remedy at law. *Mann v. Golub*, 182 W.Va. 523, 389 S.E.2d 734 (1989); *Manning v. Bleifus*, 166 W.Va. 131, 272 S.E.2d 821 (1980). The Court has concluded here that the plaintiff will face no irreparable harm. Any damages that Amtote may suffer can be fully compensated by money damages. Amtote, by not paying the $500,000 due the defendants under the Binding Agreement, may not have complied with the material terms of the contract, and as such, may not be entitled to specific performance. *Buffalo Coal & Coke Co. v. Vance*, 71 W.Va. 148, 76 S.E. 177 (1912); *American Apparel Products, Inc. v. Brabs, Inc.*, 880 S.W.2d 267 (Tex.App.1994); *Kelley v. Leucadia Financial*

*cial Corp.*, 846 P.2d 1238 (Utah 1992). Finally, West Virginia law has a mutuality of remedy requirement, meaning that if a plaintiff is entitled to specific performance, the defendant must be entitled to it as well. *Geo. Warren Co. v. A.L. Black Coal Co.* 85 W.Va. 684, 102 S.E. 672 (1920); *Morgan v. Bartlett,* 75 W.Va. 293, 83 S.E. 1001 (1914). Here, Penn National can not specifically enforce the contract for one provider because GTECH and Amtote are now separate companies. Since Penn National cannot obtain specific performance, Amtote may ultimately not be entitled to specific performance as well.

### IV. CONCLUSION

Based upon the facts presented and the balancing-of-the-hardship test, the Court concludes that the plaintiff should not be granted a preliminary injunction.

The Court, therefore **ORDERS** that the plaintiff's request for a preliminary injunction be **DENIED.**

For purposes of an orderly transition of tote business services, the Court also ORDERS that the temporary restraining order shall expire as of February 28, 1998, at 12:00 a.m. midnight.

The Clerk is directed to transmit true copies of this Order to all counsel of record herein: