**LANVIN INC., Plaintiff,**

v.

**COLONIA, INC.,
Defendant/Third–Party Plaintiff,**

v.

**LANVIN PARFUMS S.A.,
Third–Party Defendant.**

**No. 89 Civ. 5333 (DNE).**

United States District Court,
S.D. New York.

June 12, 1990.

Fulbright Jaworski & Reavis McGrath, Marc S. Dreier, Donald J. Lough, and Joyce Kanciper, of counsel, Felfe & Lynch, New York City, Marius J. Jason, of counsel, for Colonia, Inc.

## OPINION & ORDER

EDELSTEIN, District Judge:

### BACKGROUND

An Order to Show Cause was brought before this court requesting a Temporary Restraining Order and a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. The Order to Show Cause was returned unsigned and instead, the court held a hearing on the Preliminary Injunction issue. Defendant seeks to preliminarily enjoin plaintiff from distributing its products without defendant, alleging that it will suffer irreparable harm if the relief sought is denied.

For the reasons stated below, defendant has not met the burden required to obtain a preliminary injunction. Accordingly the defendant's motion is denied.

### THE PARTIES

Plaintiff, Lanvin Inc., is a Delaware corporation with its principal place of business located in New York, New York. It is the exclusive licensee of the trademarks "Lanvin" and "Arpege" for various fragrances and toiletry products (the "Licensed Products") in the United States.

Third–Party Defendant, Lanvin Parfums S.A., is a French corporation with its principal place of business located in Paris, France. It owns the "Lanvin" and "Arpege" trademarks referred to above. It and its affiliates manufacture fragrance products and the essential oils used in such products, for distribution through distributors and/or licensees worldwide.

Defendant, counterclaim plaintiff and third-party plaintiff, Colonia, Inc. ("Colonia") is a Connecticut corporation with its principal place of business located in Connecticut. Colonia is in the business of manufacturing, marketing and distributing various brands of fine fragrances.

Battle Fowler, New York City, Betsy L. Anderson and W. Bruce Johnson, of counsel, for Lanvin, Inc.

## THE INSTANT SUIT

On or about January 8, 1981, Lanvin Inc. entered into a License Agreement (the "License Agreement") and a Supply Agreement (the "Supply Agreement") with a predecessor of Colonia. Pursuant to the terms of the two agreements, Lanvin Inc. granted to that predecessor the exclusive rights to use Lanvin's trademarks in connection with fragrances and toiletries in the U.S. (the "Territory") from January 1, 1981 through November 30, 1995. License Agreement Arts. 1(a), 1(c), 1(d), 1(e), 2(b), 3. That party, for its part, agreed to purchase fragrance essence from Lanvin to be used as the basis for the manufacture of Licensed Products by that party in the U.S. for distribution in the Territory. License Agreement Art. 13(c) at 19; Supply Agreement Art. 5.

In or about December 1983, Colonia succeeded to its predecessor's rights and duties under the two agreements.

Lanvin Inc. commenced the instant action on August 8, 1989 by filing a Complaint alleging that Colonia materially breached the License Agreement by selling substantial quantities of Lanvin's Licensed Products under such circumstances that Colonia would have or should have reasonably expected that the Licensed Products would be resold outside of the Territory. Lanvin claimed damages of over $2 million.

Article 2(c) of the License Agreement provides that while Colonia may utilize other distributors to distribute and sell Licensed Products "in the Territory," Colonia "shall remain primarily responsible and liable for the fulfillment of all its obligations under the Agreement," and all such distributors shall "undertake to take no action inconsistent with "the obligations imposed on [Colonia] under this Agreement." Article 2(i) provides, in relevant part, that Colonia:

> (i) ... and its Distributors, if any, shall refrain from selling Licensed Products to vendees under such circumstances that the resale of those Licensed Products outside of the Territory may reasonably be expected to result and shall cooperate fully with [Lanvin Inc.] and its Affiliates

and their Licensees to prevent or reduce the likelihood of such resales. Any sale of Licensed Products by [Colonia] or its Distributors shall be deemed not for export outside the Territory if the seller has in good faith no reason to believe that export outside the Territory of the Licensed Products sold is probable.

On August 28, 1989 Colonia served an Answer and Counterclaims denying Lanvin's allegation and counterclaiming for $5 million in damages. For its First Counterclaim, Colonia alleged that Lanvin had no right to terminate without first providing Colonia with 60–days' notice and an opportunity to cure.

Colonia's Second Counterclaim alleges that Lanvin sold substantial quantities of the Licensed Products under such circumstances that Lanvin would have or should have reasonably expected that the products would be exported into the Territory. The Third Counterclaim alleges that Lanvin failed to provide Colonia with new Licensed Products. The Fourth Counterclaim alleges that Lanvin wrongfully terminated the License and Supply Agreements.

On September 7, 1989, Colonia also served a third-party complaint against Lanvin Parfums, S.A., claiming that company should guaranty any liability Lanvin Inc. may have to Colonia.

The parties subsequently exchanged documents. No depositions have yet been taken.

## THE INSTANT MOTION

Colonia brought on the instant motion by Order to Show Cause on February 28, 1990, requesting a Temporary Restraining Order and a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. The Order to Show Cause was returned unsigned and a three-day evidentiary hearing was held.

Colonia asks this court to reinstate Lanvin's relationship with Colonia *pendente lite* and to prevent Lanvin from "conveying or otherwise interfering with" the rights contained in the License and Supply Agreements. Colonia alleges that it will suffer

irreparable injury in two respects if preliminary relief is denied. First, it claims that because the majority of Lanvin's stock was sold to a company called Orcofi S.A. on February 16, 1990, and because it was announced at that time that Orcofi would later sell half of its shares to another company, L'Oreal, then L'Oreal might well begin marketing Lanvin fragrances in the United States. Colonia further alleges that if that occurred, Colonia's business would be permanently injured. Colonia's second claim of irreparable harm is that its inventory of Lanvin fragrance essence necessary for the manufacture of the Licensed Products is "soon to be exhausted" and "already is insufficient to meet orders for the Christmas [1990] season ..." Colonia's Memorandum of Law at 3.

With its motion, Colonia served an Amended Answer and Counterclaims, which is substantially similar to its original Answer and Counterclaims served in August 1989 except that it adds a Fifth Counterclaim alleging irreparable harm. Colonia now demands, in addition to the $5 million in compensatory damages and punitive damages requested, an injunction to reestablish the License Agreement between Lanvin and Colonia, and an injunction against Lanvin's distributing Lanvin products, except through Colonia, until November 30, 1995. The same injunctive demands are made in an Amended Third–Party Complaint against Lanvin Parfums S.A.

Lanvin's position is that Colonia has not shown irreparable harm; that Colonia is unlikely to succeed on its claims, including its claim that the termination of Colonia was wrongful; that Colonia has not presented serious questions going to the merits; and that the balance of hardships does not tip decidedly in Colonia's favor.

Colonia sells 20 different brand names of fragrances. These include: Gucci, Camp Beverly Hills, Balmain, Charles Jourdan, Maja, Pavlova, Ivoire, Vent Vert, Silences, L'Innocent, Jolie Madame, Un Jour, Votre, Payot, Jenny, Replique, Tabac, Carrera, Dallas, Jacomo, and 4711. Colonia's business grew from $12 million in sales in 1983 to $50 million in 1989.

Colonia's president and chief executive officer, Lawrence Pesin, testified that the fragrance industry is characterized by new promotional activity, with consumers responding to new brands and the introduction of new products. Colonia's growth was based on Colonia's introduction of two new brands from Gucci and one from Camp Beverly Hills. Pesin further testified that, consistent with the way the fragrance market works, all of the profits Colonia has made since 1983 have been generated by its new brands.

Pesin testified that Lanvin has not introduced a new brand since its relationship with Colonia began in 1983. Because of Colonia's introduction of new products, the proportion of its overall sales represented by Lanvin has declined. Sales of Lanvin products constituted approximately 10 percent of Colonia's business in 1989.

One of the fragrances Colonia sells, 4711, is a famous fragrance manufactured by Colonia's German parent corporation, itself called "4711." In 1989 that company had $300 million in revenues and eight manufacturing subsidiaries worldwide.

Another of the fragrances sold by Colonia, Gucci No. 3, a prestige fragrance, was Colonia's biggest selling brand in 1989. Another Colonia fragrance, Jenny, started in 1989, is also a prestige fragrance.

Following the termination by Lanvin, Colonia launched a new fragrance called "Only," associated with the Spanish singer Julio Iglesias. "Only" had a significant impact because it gave Colonia entry and strength in stores that Colonia had been attempting to grow in over the years. Although the fragrance was not available until the last four months in 1989, it contributed over 10 percent of all Colonia's sales in 1989. Colonia also launched a "21 Club" fragrance in 1989.

Colonia is the exclusive licensee of Graceland Enterprises, licensor for a perfume called "Moments," associated with Elvis Presley's widow, Priscilla. Colonia intends to launch "Moments" in 1990.

Colonia projects that its sales will expand in 1990. One of the witnesses for Lanvin,

Marc Kapustin, is the export manager of Lanvin Parfums S.A. Kapustin testified that he was in charge of reviewing the sales records sent by Colonia to Lanvin each year.

In or about July 1988, Colonia sent to Kapustin the "Colonia, Inc. Sales Recap by Corporate Number," Plaintiff's exh. 16. That document purports to show all Arpege sales made by Colonia to its customers in the first six months of 1988, including the comparative differences between 1988 and 1987.

In or about March 1989, Colonia provided Kapustin with several additional sales documents for 1988. One was the "Corporate Ranking by Gross Dollars," Plaintiff's exh. 14, which purports to provide all the customers for all "Arpege"-labelled products sold by Colonia in 1988. The document lists a total of 1,288 customers. The customer with the largest total purchases in 1988 was J.C. Penney, with purchases of $774,691.10, constituting 17.2 percent of Colonia's total sales of Arpege in 1988. Osco Drug, Inc., another retailer, was fifth with $103,478. Page 27 of the documents indicates that the 1,288 customers listed account for 100 percent of Colonia's Arpege sales in 1988, amounting to $4,503.592. Plaintiff's exh. 14.

Another document Colonia sent to Lanvin, the "Product Ranking By Gross Dollars/Arpege," Plaintiff's exh. 15, provides the relative product rankings, by product number, for all the different "Arpege"-labelled products sold by Colonia in 1988. The fourth entry on page 1, Arpege Eau de Toilette 1–oz. spray, carries product number 85199, with total sales of $334,625.

Colonia also sent Royalty Statements to Lanvin for every quarter in 1988, and for December 1988 through February 1989. Plaintiff's exhs. 17 and 18. The portion of sales reported in the Royalty Statements that is attributable to sales of Arpege-labelled products corresponds with the figures in the "Corporate Ranking by Gross Dollars," plaintiff's exh. 14, and the "Product Ranking By Gross Dollars," plaintiff's exh. 15.

In early 1989, Lanvin announced that it was going to be purchased by Midland Bank. A director of Midland Bank, Leon Bressler, became Lanvin's chairman and chief executive officer. Also in early 1989, Lanvin announced that it was taking a more aggressive stance with respect to unauthorized transshipments ("gray-marketing") of Lanvin's "Arpege" products. Plaintiff's exh. 6. Prior to that time, Lanvin products manufactured by Colonia had been found outside the Territory on several occasions, and Lanvin revealed complaints from several of its distributors regarding the products.

In September 1988, Lanvin sent to Colonia a letter enclosing an advertisement from a British newspaper advertising Arpege product allegedly "Imported from USA." Plaintiff's exh. 8 at 2. The ad stated: "by special arrangement we can sell direct to you—world famous guaranteed genuine designer perfume—the real thing. No extra overheads, no middle men...." Plaintiff's exh. 8 at 2. Lanvin told Colonia that Lanvin was "extremely concerned by such an occurrence" and was:

> ... under great pressure from our United Kingdom retailers and distributor to solve the problem, i.e. to stop what we consider to be parallel imports from the United States.... [T]he advertised products originate from your company, as proved by the items in our possession, and this is in line with the "Imported from USA" caption of the advertisement....

Plaintiff's exh. 8.

Lanvin subsequently received other letters from its British distributor referring to complaints by retailers about the mass-market sale of Arpege product in the United Kingdom. Plaintiff's exhs. 22, 23. One of the ads alleged a "United Kingdom–United States promotional campaign...." Plaintiff's exh. 22 at 2.

In September 1988, Lanvin received a complaint from its Hong Kong distributor regarding unauthorized imports of Arpege spray. Plaintiff's exh. 27.

In March 1989, Lanvin received a letter from its Australian distributor complaining

about Arpege product from the U.S. Plaintiff's exh. 25. Colonia itself, meanwhile, received from Australia a memorandum purporting to have uncovered "further stock of U.S. based Arpege," and asking Pesin whether he could "tell us any more about where this stock is being shipped from?" Plaintiff's exh. 9.

In the spring of 1989, Lanvin found approximately 100,000 bottles of Arpege Eau de Toilette 1-oz. spray, manufactured by Colonia, in three locations in Europe: 15,000 in Zurich; 20,000 in Hamburg; and 60,000 in Antwerp. Lanvin purchased the goods. The price suggested that there could be many intermediaries involved in the transshipments.

In the summer of 1989, Lanvin's new management sent its accountants to Colonia to examine Colonia's sales records. Among the documents found was a "Colonia Inc. Stock Analysis By Line Based on Current Cost," Plaintiff's exh. 19. Lanvin had not previously seen this document. Lanvin found that the information it contained was totally inconsistent with the documents previously provided to Lanvin (plaintiff's exhs. 14–18), concerning both Colonia's customers and Colonia's sales, even though the documents previously provided purported to state all customers and all sales.

First, Plaintiff's exh. 19 contains many references to "Special Sales" or "Sp. S1." None of the documents previously provided to Lanvin, plaintiff's exhs. 14–18, contains any such references, and Colonia had not previously discussed "Special Sales" with Lanvin.

The "Special Sales" set forth in the new documents contained other information not previously disclosed. For instance the total sales for Arpege Eau de Toilette 1-oz. spray in 1988, as previously shown to Lanvin shown in plaintiff's exh. 15, was $334,625. The total of "regular" sales and "Special Sales" in plaintiff's exh. 19 was, however, $824.215, substantially more than twice the amount previously reported to Lanvin for this one Arpege product.

The total of "regular" sales of Arpege Eau de Toilette 1-oz. spray (product number 85199) on page 47 of plaintiff's exh. 19 is actually *less* ($229,260) than the total sales of that product number shown in plaintiff's exh. 14. However, page 47 of plaintiff's exh. 19 contains two additional entries with two additional product numbers, even though the product is exactly the same. Each of these two new entries is for a "Special Sale," with a special product number containing an additional digit (product numbers 85199*1* and 85199*2*, versus 85199 in Plaintiff's exh. 15 and on page 46 of Plaintiff's exh. 19).

No product number for *any* Lanvin product contained an extra digit in *any* of the documents previously provided to Lanvin. These additional product numbers (and the substantial additional sales they show) had never been previously disclosed to Lanvin. Tr. 234–36.

Adding the $520,368 and $74,587 for the two listings of Arpege Eau de Toilette 1-oz. spray "Special Sale" entries on page 47 of Plaintiff's exh. 19, to the $229,260 for Arpege Eau de Toilette 1-oz. spray on page 46 (product number 0085119), one reaches the previously undisclosed total of $824,215, more than twice the $334.625 previously reported to Lanvin in Plaintiff's exh. 15.

Plaintiff's exh. 19 also had an entirely different history of product returns from that previously provided by Colonia. An after-sale return rate of 10–15 percent is typical. The regular sales on page 46 did show returns. However, the two extra-digit "Special Sales' showed zero returns of this product to Colonia.

During their audit at Colonia, Lanvin's accountants also found a number of invoices pertaining to "Special Sales." These invoices, plaintiff's exhs. 7, 10, 11 and 12, had not been previously provided to Lanvin.

Although the documents (plaintiff's exhs. 14–18) purported to list all of the Arpege customers, none of the customers on the various invoices appeared on any of those documents.

Thus, the documents uncovered by Lanvin's accountants in the summer of 1989 (plaintiff's exhs. 7, 10, 11, 12 and 19) were

seriously inconsistent with the documents (plaintiff's exhs. 14 and 15) that Colonia had previously provided to Lanvin, in that they showed substantial Arpege sales previously unreported, to Arpege customers previously unreported, leading to a total sale more than twice the reported sale.

With the information gathered from the accountants' audit of Colonia's documents, and knowing of the existence of the 100,-000 pieces of Arpege in Europe, in August 1989, Bressler decided to terminate Colonia. Tr. 349–51. Bressler testified that, based on his business experience, the substantial accounting inconsistencies uncovered by Lanvin's accountants and the existence of 100,000 pieces of U.S. made Lanvin goods in Europe were linked.

In view of what Lanvin had found, it determined not to permit Colonia to invoke the 60–day notice and cure period provided in Art. 22(a)(i) of the License Agreement. Defendant's exh. 1. L'Oreal played no role in Bressler's decision to terminate Colonia.

Bressler's termination letter, addressed to Pesin and dated August 8, 1989, stated that Lanvin was immediately terminating the License Agreement and Supply Agreement because Colonia had permitted massive transshipments of Lanvin products outside the Territory, in violation of Art. 2(i) of the License Agreement, Defendant's exh. 1. Bressler added, however:

> ... for a period of two months we will respond to any reasonable and necessary request to help you fulfill any specific outstanding orders, so long as such orders do not themselves entail additional violations of the agreements. With that exception, our relations are at an end.

Defendant's exh. 3.

On August 11, 1989, Pesin responded to Bressler's letter, indicating that unless Lanvin changed its position, in one week Colonia would cancel all advertising and promotional support for Lanvin, adding that the termination would cause Colonia a loss of profits and goodwill, leading to a claim for damages. Defendant's exh. 4.

In a response to Pesin dated August 25, 1989, Bressler reiterated to Pesin Lanvin's position that the relationship was over.

The letter repeated that Lanvin would supply Colonia for two additional months, adding:

> ... in the unlikely event that you encounter any particular order fulfillment problem after conclusion of the two months' grace period, we will duly consider any reasonable request you might wish to make at that time. You should understand, however, that any such consideration would be given only as an accommodation to you, and not incident to an ongoing business relationship between us.

Defendant's exh. 5. at 2n.

Pesin testified that he did not personally respond to Bressler's two letters to him because he does not himself "deal with ordering merchandize," and because previously all Colonia's orders for Lanvin products had gone to Lanvin's export manager rather than its chairman, and Colonia was "never given any information that the purchasing order methodology was changed" since Bressler's arrival at Lanvin.

On November 27, 1989, Pesin told *Women's Wear Daily* that Lanvin "has refused to ship" additional merchandise. Pesin testified that in the two months following his receipt of Bressler's letters, Colonia frequently asked Lanvin, in writing and by telephone, to fill existing orders. Colonia introduced no evidence, however, that Pesin or anyone from Colonia ever responded to Bressler's invitations to order more product, between the termination on August 8 and the following December. Tr. 78–79.

The first evidence of any response by Colonia to Bressler's two letters of August 1989 was a memorandum of Jack Gordon of Colonia dated December 4, 1989 to Marc Kapustin of Lanvin, Plaintiff's exh. 4.

On November 27, 1989, one week prior to the Gordon memorandum, Pesin stated that Colonia still had "substantial inventories [of Lanvin product] which we will continue to sell." Nevertheless, the Gordon memoranda stated: "The situation of our side for the above [Lanvin] essence, in particular, is now becoming critical...." When Pesin

was asked on cross-examination why, in light of that language in the Gordon memorandum, he did not direct his counsel at that time to ask for relief from the court, he responded:

> I'm a manufacturer of fragrances. I don't know what you mean by "directing my counsel". This is the way we deal with business. We request merchandise. We had hoped to get it.

The Gordon memorandum indicated that Colonia was preparing a complete forecast for Lanvin sales in 1990. Plaintiff's exh. 4. In a response dated December 12, 1989, Kapustin of Lanvin indicated that the two-month grace period had long since terminated, adding:

> Now, four months after the agreement ended, and two months after the grace period ended, you say you want more product. Indeed, you even say you are preparing a forecast for 1990. I'm sorry, Jack, but you waited too long. We wanted to cooperate in making an easy transition for COLONIA, but you didn't want any product then, and now you are—for some reasons I don't understand—pretending its still "business as usual."

Plaintiff's exh. 5. Kapustin also asked for immediate payment for the Lanvin product delivered in May and June 1989, which was due, at the latest, by October 31, 1989. Plaintiff's exhs. 1 and 2.

Following receipt of Kapustin's response, Pesin neither contacted Lanvin himself nor directed Gordon to do so. Nor did Colonia pay the invoices.

In February 1990, 95 percent of Lanvin was purchased by Orcofi, S.A. Tr. 362. Orcofi had first approached Lanvin in October 1989, two months after Bressler's termination of Colonia.

In his August 11, 1989 letter to Bressler, Pesin stated that Colonia "has taken extreme care to clearly define the Territory of Sale to all Distributors. These Distributors, in turn, clearly defined the Territory of sale to all of their customers. This is documented." Defendant's exh. 4 at 1.

Pesin testified on direct examination that Colonia "orally and in writing had all of our distributors commit to us their intent to sell within the United States, to instruct their customers, whoever they may be, of this restriction and to include on their invoices a legend that would indicate the restriction required." Nevertheless, there was no admissible evidence that Colonia had all of its distributors commit to sell only with the U.S. Nor was there evidence that Colonia had all of its distributors instruct their customers to restrict their sales to the U.S.

Colonia did not place on its own invoices any statement that Lanvin goods should not be shipped out of the U.S. Plaintiff's exhs. 7, 10, 11 and 12.

Pesin testified that Colonia never asks the drop-shipment vendees on its invoices to sign a contract stating that the Lanvin goods will not be shipped out of the U.S., nor did Colonia ever ask any drop-shipment vendees or other indirect vendees whether they reship Lanvin products outside the U.S., nor instruct them to not do so, nor instruct them to sign undertakings to that effect.

The Kay International invoice for 3,000 bottles of Arpege Eau de Toilette 1–oz. spray sold to A. Rosenblum, Inc. and dated March 29, 1989, bears no language restricting exportation. Plaintiff's exh. 10. Colonia never sent any agreement to A. Rosenblum to sign stating that it would not transship Lanvin product.

Pesin further testified that Colonia took no precautions with retailers, since he did not consider it reasonable to expect that a retailer to whom Colonia sold Lanvin product would be involved in exportation. Pesin subsequently admitted, however, that gray-marketers commonly set up a legitimate retail perfume business that actually sells little, but which is used for ordering perfume at wholesale prices, directing much of the perfume to the gray market.

One of Colonia's drop-shipment vendees was International Cosmetic Exchange of New Britain, Connecticut. Plaintiff's exh. 11. Pesin testified that he had no idea why the company was called International Cosmetic Exchange, and neither knew, nor had ever asked anyone, whether International

Cosmetic Exchange ever ships perfume out of the U.S.

The invoice (plaintiff's exh. 11) is for 70,000 pieces of Arpege Eau de Toilette 1-oz. spray to be sold to Kay International, for shipment to International Cosmetic Exchange, an order totalling $227,500. When asked whether it was a large sale of Lanvin product, Pesin testified: "Not as far as we're concerned. Otherwise, we wouldn't have sold it." Tr. 130. However, when shown all of the Colonia invoices as a group, Pesin admitted that none contained a sale anywhere near the $227,500 sale in plaintiff's exhs. 11 and 12;

Further, the single $227,500 sale of one single product (Arpege 1-oz. Eau de Toilette spray) was larger than the combined sales of all Arpege products in all of 1988 to all but the two largest (J.C. Penney and Osco Drug, Inc.) of the 1,288 customers listed in the "Corporate Ranking by Gross Dollars" provided by Colonia to Lanvin in March 1989, Plaintiff's exh. 14. The one sale was thus substantially larger than *all* 1988 sales of *all* Arpege products to: Sears, I. Magnin, Montgomery Ward, Bloomingdales, Neiman Marcus, and other purportedly major customers of Colonia for Lanvin products.

Lanvin was unaware that International Cosmetic Exchange was a Colonia vendee until the audit in the summer of 1989. Pesin testified that it was "conceivable" and a "reasonable assumption" that Colonia had shipped Lanvin product to International Cosmetic Exchange. Pesin testified that he was unaware that the owner of International Cosmetic Exchange, Hyman Moore, was a gray-marketer. Pesin further testified that Kay International informed him that International Cosmetic Exchange might be shipping Lanvin products out of the United States. Nevertheless, he did not contact Lanvin about International Cosmetic Exchange because he did not believe he was required to do so. Pesin testified that Colonia's parent, 4711, a German company with eight subsidiaries worldwide, consistently and vigorously defends its "4711" brand when it uncovers gray market incidents in its various markets.

Nevertheless, Pesin further testified that he did not know of any gray-marketers that transship fragrances from the U.S. to abroad, and knew of no company that has a reputation for gray-marketing fragrances from the U.S. to abroad.

On September 25, 1989, another of the perfume brands carried by Colonia, Balmain, sent Pesin a memorandum, enclosing an article in the French newspaper *le figaro*. Defendant's exh. 9. The memorandum stated that the article "had some very unkind words" for Colonia regarding its distribution of Lanvin, adding the following translation from the newspaper: " '... to succeed the American distribution [of Lanvin] needs to be put into order, as over the years it has become a mass-market Network which is degrading for the brand.' "

One of Colonia's drop-shipment vendees of Lanvin products found on the invoices in the summer of 1989 was C & C Beauty Sales in Miami, Florida. Plaintiff's exh. 12 at 8. C & C Beauty Sales was not listed in plaintiff's exh. 14, previously provided by Colonia to Lanvin as a complete list of customers. Pesin testified that C & C Beauty Sales is a wholesaler and distributor of fragrances and cosmetics. Pesin admitted that Colonia sold 3,000 units of Arpege Eau de Toilette 1-oz. spray in "Special Sales" to Cosmetrade, to be shipped to C & C Beauty Sales. Plaintiff's exh. 12 at 8.

Pesin indicated that he had no knowledge of C & C Beauty Sales having a reputation as a gray-marketer. Pesin testified that Lanvin had never said that Lanvin products should not be sold to C & C Beauty Sales, while Kapustin of Lanvin testified that Colonia had agreed with Lanvin that Colonia would not supply Lanvin product to C & C Beauty Sales.

An article dated December 25, 1988 in the *Miami Herald* states: "Rene Antonio Garcia now heads a company that diverts perfume into the 'gray market' ", adding that Garcia is "secretary of C & C Beauty Sales...." Plaintiff's exh 13. Pesin testified that he pays no attention to newspaper clippings provided to Colonia by a public

**192**

relations company and does not recall seeing the article.

## DISCUSSION

■ A preliminary injunction is an extraordinary remedy not to be routinely granted. *Medical Soc. of New York v. Toia*, 560 F.2d 535, 538 (2d Cir.1977). In the Second Circuit, it may be granted only on a showing of: "(1) irreparable harm and (2) either (a) a probability of success on the merits or (b) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in the moving party's favor." *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 41–42 (2d Cir. 1986) (citing authority); *Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

### Irreparable Harm

■ Preliminary relief is not to be granted without a showing of irreparable harm. *Arthur Guinness & Sons, PLC v. Sterling Publishing Co.*, 732 F.2d 1095, 1099 (2d Cir.1984). The threatened irreparable harm must be actual and imminent, not remote and speculative. *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745 (2d Cir.1977). Failure to show irreparable harm is sufficient grounds for denying preliminary relief even if the other requirements of the preliminary injunction standard are met. *Arthur Guinness & Sons, PLC, supra*, 732 F.2d at 1100.

■ Here, Colonia is asking for an injunction prohibiting Lanvin from distributing its products without Colonia, and also a mandatory injunction requiring Lanvin to supply Colonia with Lanvin products. A mandatory preliminary injunction is "not issued in doubtful cases" and requires a showing of "extreme or very serious damage." *Clune v. Publishers' Assoc. of New York City*, 214 F.Supp. 520, 531 (S.D.N.Y.), *aff'd on opinion below*, 314 F.2d 343 (2d Cir.1963); *followed in Grand Light and Supply Co. v. Honeywell, Inc.*, 80 F.R.D. 699, 702 (D.Conn.1978). Neither imminent irreparable harm nor extreme damage has been shown.

Colonia alleges irreparable harm on two grounds. First, Colonia asserts:

... now it is apparent that L'Oreal, through its own distribution network, will attempt to distribute Lanvin Product in the American market. If that is allowed to occur, Colonia's position and reputation in the marketplace will be irreparably impaired, regardless of the eventual outcome of this litigation.

Pesin aff. ¶ 15. Pesin admitted that his only source of information was an article in a newspaper.

Colonia adduced no evidence that L'Oreal was going to distribute Lanvin products. There is therefore no threat of imminent and actual harm, as required. *See Nuclear Regulatory Comm'n, supra*, 550 F.2d at 755.

The second thrust of Colonia's motion is that it needs to reinstate the relation with Lanvin because its supplies of Lanvin essence are nearly depleted and it needs it for the Christmas 1990 season. The depletion of Lanvin inventory at Colonia began immediately after the August 8, 1989 termination letter. Tr. 93–94. It had ample opportunity to abandon its marketing of Lanvin products, and in fact immediately informed Lanvin that it was doing so. Lanvin stated that it would help Colonia ease the termination until October 8, 1989. Clearly, Christmas 1990 is not in that time period.

■ Colonia waited over seven months to make this motion. Preliminary injunctions involve an urgent need for speedy action to protect the movant's rights. *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985). A delay, even if it does not rise to the level of *laches*, demonstrates a lack of need for speedy action. *Id.; Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*, 335 F.Supp. 278, 280–81 (S.D.N.Y. 1971) (failure to respond to letters and seven-and-one-half month delay in bringing motion; application denied).

■ Any party claiming an injury is under a duty to mitigate its damages. A

movant for extraordinary relief cannot mask an ongoing failure on its part to mitigate its damages as an ongoing instance of irreparable harm. *See American Brands, Inc. v. Playgirl, Inc.*, 498 F.2d 947, 949–50 (2d Cir.1974). Nor can it claim irreparable harm when its delay is itself the cause of whatever harm it alleges; *Gianni Cereda Fabrics, Inc., supra*, 335 F.Supp. at 280.

■ There is no legal presumption that a distributor suffers irreparable injury simply because it is terminated. *Grand Light & Supply Co., supra*, 80 F.R.D. at 710. A movant possesses an adequate remedy at law if the conduct in issue threatens only a disruption in its business but does not threaten its destruction. *Loveridge v. Pendelton Woolen Mills, Inc.*, 788 F.2d 914, 917 (2d Cir.1986); *USA Network v. Jones Intercable, Inc.*, 704 F.Supp. 488, 491–92 (S.D.N.Y.1989). The termination of a contract may result in some costs which are difficult to quantify, but such costs arise in any case where one party terminates a contract. *USA Network, supra*, 704 F.Supp. at 492–93.

■ Lanvin constituted 10 percent of Colonia's business in 1989. Irreparable harm is not shown where a distributor's volume of business with the supplier constitutes a small percentage of its total business. *George W. Warner & Co. v. Black & Decker Manufacturing Co.*, 167 F.Supp. 860, 864 (E.D.N.Y.1958); *Grand Light & Supply Co., supra*, 80 F.R.D. at 701–2. In these cases the total percentage of business was approximately 2–3%. Although the instant case involves a higher percentage of movant's business, the 10% of business at issue is still too low to demonstrate irreparable harm which could not be compensated through money damages.

■ Where a terminated distributor sells numerous other brands, it does not establish irreparable harm. *Newport Tire & Rubber Co. v. Tire & Battery Corp.*, 504 F.Supp. 143, 151 (E.D.N.Y.1980). *Deltown Foods, Inc. v. Tropicana Products, Inc.*, 219 F.Supp. 887 (S.D.N.Y.1963). This is so even though the terminating supplier is itself considered a standard of excellence, and even though the relationship has been a long one. *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 759, 760 (2d Cir.1979). Here, the evidence showed that Colonia is an expanding, well-captioned business with 20 brands, with its profits coming from its new brands, and with Lanvin representing only 10 percent of sales. These facts undermine a claim of irreparable harm.

■ Colonia suggested that the loss of Lanvin will disrupt sales and cause it to lose customers. Conclusory statements to this effect are insufficient to establish irreparable harm. *Jackson Dairy, Inc., supra*, 596 F.2d at 72–73; *Connecticut Resources Recovery Authority v. Occidental Petroleum Corp.*, 705 F.2d 31, 37 (2d Cir. 1983). This is particularly so where, as here, the allegations of irreparable harm through loss of customers is asserted only by the movant itself, without adequate evidence of how such losses would take place and how the movant would be injured thereby. *Grand Light & Supply Co., supra*, 80 F.R.D. at 702 (*distinguishing Interphoto Corp. v. Minolta Corp.*, 295 F.Supp. 711 (S.D.N.Y.), *aff'd*, 417 F.2d 621 (2d Cir.1969).

Colonia failed to show that its business was in danger of irreparable harm pending trial. Such a showing would involve substantial proof that the denial of interim relief will place the dealer at a serious competitive disadvantage, such as when the supplier's products are a major part of the movant's business and where all dealers in an area must carry those products in order to survive. *See, e.g., Jacobson & Co. v. Armstrong Cork Co.*, 416 F.Supp. 564, 569–70 (S.D.N.Y.1976), *aff'd*, 548 F.2d 438 (2d Cir.1977) (preliminary relief appropriate where 80 percent of distributor's sales were supplier's product, all of distributor's competitors had supplier's product, and customers specified supplier's product). This in turn requires substantial evidence that various customers have abandoned or are threatening to abandon the terminated distributor because of the termination. *Jack Kahn Music Co., supra*, 604 F.2d at 763; *Grand Light and Supply Co., supra*,

80 F.R.D. at 702. Alternatively, there must be a substantial showing that the loss of one product line causes the loss of other product lines, leading ultimately to the destruction of the movant's business. *Joyce Beverages of New York, Inc. v. Royal Crown Cola Co.*, 555 F.Supp. 271, 280 (S.D. N.Y.1983).

Colonia did not adduce substantial proof tending to prove that it would suffer irreparable harm under any of these theories. The evidence showed repeated admissions by Colonia that its claims are compensable in damages. In his August 11, 1989 letter to Bressler, Pesin stated that if Lanvin failed to prove its allegations of transshipment, Lanvin would be liable "for the significant damages that [Colonia] will suffer," including "the loss of gross profit for the balance of the year" and the loss of profit "for the balance of the contract." Defendant's exh. 4 at 1.

Pesin testified that Colonia is totally computerized and has tables of statistical information indicating product increases and decreases, including the profitability of promotions in advertising efforts, all charted by a computer on a monthly basis. Tr. 174–75. Colonia's 1989 sales of Lanvin is already recorded, as is its profit margins and its proportion of Colonia's total business. Tr. 46, 175.

■ Proof that a profitable line of business has been lost is insufficient to show irreparable harm. *Jack Kahn Music Co., supra*, 604 F.2d at 763; *Loveridge, supra*, 788 F.2d at 917. There is no showing of irreparable harm where, as here, the proof is that computations would permit the calculation of future losses. *Grand Light & Supply Co. v. Honeywell, Inc.*, 80 F.R.D. 699, 702 (D.Conn.1978) (computation of future profit based on past orders calculable).

When asked about the $5 million damage claims in the "WHEREFORE" clause of Colonia's Answer and Counterclaim dated August 28, 1989, Pesin testified that that figure represented "our loss of goodwill and credibility in the trade," constituting "an amount that is obviously in excess, in our minds, of this figure of $5 million...." Tr. 137.

Pesin's August 11, 1989 letter to Bressler, Defendant's exh. 4, also refers to a loss of goodwill. In that letter, Pesin stated that if Lanvin failed to prove its allegations regarding transshipment, Lanvin would be liable for Colonia's loss of ... goodwill for the balance of the contract." Pesin testified that the loss of goodwill he was referring to was Colonia's "credibility with the trade, its inability to meet commitments that we had made." Tr. 87.

■ Allegations of losing goodwill built over the life of a licensing agreement do not establish irreparable injury where, as here, evidence provided by the movant itself constitutes an admission that any injury stemming from the termination of the license agreement is quantifiable in damages. *See Marisa Christina, Inc. v. Freis*, 646 F.Supp. 252, 254 (S.D.N.Y.1986). To the extent a reputational injury can be shown, such injury is compensable in money damages. *Litho Prestige, Div. of Unimedia Group, Inc. v. News America Publishing, Inc.*, 652 F.Supp. 804, 808 (S.D. N.Y.1986), *citing Jack Kahn Music Co., supra*.

Promotion and advertising costs are also compensable in damages. *Jack Kahn Music Co., supra*, 604 F.2d at 763. In any event, Pesin informed Bressler that Colonia was stopping all promotion and advertising as of August 1989. Defendant's exh. 4.

*Likelihood of Success*

To establish "likelihood of success," a movant must show that it is "substantially likely to prevail on the merits" of the underlying dispute. *Arthur Guinness & Sons, PLC, supra*, 732 F.2d at 1101.

Colonia alleges that it is likely to succeed on the merits "because there is no basis whatsoever for the claim that Colonia has breached the territorial limitation of the Agreements." Pesin aff. ¶ 9. First, Colonia states that the complaint Lanvin served in August 1989 was "unfounded" and that Lanvin's termination of Colonia is "utterly baseless," as well as a "shamelessly transparent contrivance to 'legitimize' [Lanvin's] termination of the Agreements so that it can proceed with its sale without the rights to the all-important American market tied

up." Pesin aff. ¶ 13; Colonia's Memorandum of Law in Support of its Motion for a Preliminary Injunction at 9. Colonia asserts that the "real motive" behind the termination "has now become apparent," in that on February 16, 1990 the press stated that Orcofi S.A., "an investment group lead by the Vuitton family of Paris, had acquired or was planning to acquire a 95 percent stake in Lanvin." Pesin aff. ¶ 13. Pesin alleged that the termination in August had been "contrived" as a "necessary first step before the sale of Lanvin." Pesin aff. ¶ 15. Pesin testified that his only source for this knowledge was an article in the newspaper. Tr. 150.

 Colonia has not shown that it is likely to prevail. First, Colonia failed to adduce any evidence to support its charge that the "real motive" for the termination was to get rid of Colonia so L'Oreal could begin distributing Lanvin products. In short, Colonia never refuted the testimony of Bressler, that L'Oreal played no role in the termination, and that Orcofi did not even approach Lanvin until October 1989, that is, after the termination.

In this case, "success on the merits" for purposes of preliminary relief entails not simply establishing damages, but establishing that the trial will likely result in Colonia's obtaining a mandatory injunction, under *Clune, supra,* to force Lanvin to market its products exclusively through Colonia until December 1995.

In the contractual setting, damages are the rule, not the exception. *See Litho Prestige Div. of Unimedia Group, Inc., supra,* 652 F.Supp. at 809. Enjoining parties to do business with each other has been held to be a particularly undesirable result, where, as here, there is no longer a relationship of trust. *Id.* at 809–10. It is also undesirable because it might require the Court to supervise and monitor the relationship. *Id.* (citing authority).

Colonia has not shown that it is likely that its License and Supply Agreements with Lanvin will ultimately be reinstated. A party who has breached a contract may not insist upon its enforcement. *Marisa Christina, Inc., supra,* 646 F.Supp. at 254

(citing authority). As against Colonia's charge that Lanvin wrongfully terminated the Agreements in order to clear the way for L'Oreal, Lanvin adduced evidence that it terminated Colonia because of: 1) substantial discrepancies between the Colonia documents Lanvin's accountants saw at Colonia in the summer of 1989 (plaintiff's exhs. 7, 10–12 and 19) and the documents (plaintiff's exhs. 14–18) Colonia previously provided to Lanvin; and 2) the presence of 100,000 Colonia Arpege products in three locations in Europe. Tr. 284–86, 297–98, 301, 305. Given this substantial evidence, refuted only by Colonia's allegations regarding L'Oreal, Colonia has not shown that it is likely to succeed on the merits.

 A party may unilaterally terminate a contract where the other party has breached and the breach is material. *D.C. Films, Inc. v. Best Film & Video Corp. (In re Best Film & Video Corp.),* 46 B.R. 861, 873 (E.D.N.Y.1985), *following Olin Corp. v. Central Indus., Inc.,* 576 F.2d 642 (5th Cir.1978); *Seneca Wire & Manufacturing Co. v. A.B. Leach & Co.,* 247 N.Y. 1, 7–8, 159 N.E. 700, 702 (1928); *Callanan v. Powers,* 199 N.Y. 268, 284, 92 N.E. 747, 752 (1910). A material breach is one that has been defined as one that would justify the other party to suspend his own performance of the contract. 6 Williston on Contracts § 864 at 290 (3rd ed.1963); 12 Williston on Contracts § 1469 at 186 (3rd ed. 1970).

 Colonia further contends that it is likely to succeed on the merits because Lanvin terminated the License Agreement and Supply Agreement without providing 60 days notice and an opportunity to cure, as provided in License Agreement ¶ 22(a)(i), Defendant's exh. 1 and ¶ 17(b) of the Supply Agreement, Defendant's exh. 2. Pesin aff. ¶ 8.

Unless a notice provision is exclusive, however, it is only a cumulative remedy and does not bar the ordinary remedy of termination without notice for a breach which is material or which goes to the root or essence of the contract. *In re Best*

*Film & Video Corp., supra,* 46 B.R. at 874 (citing authority).

Colonia has not paid Lanvin the balance of 1989 royalties that were due at the end of 1989 and in early 1990, amounting to approximately $250,000. Tr. 70. In 1990 Colonia continues to accrue royalties due to Lanvin that are unpaid. Tr. 93.

Colonia refused to pay invoices for Lanvin essence that Lanvin delivered to Colonia prior to the August 8, 1989 termination, totalling 226,093 FF. Plaintiff's exhs. 1 and 2; Tr. 71. The latest of the various due dates for these invoices was October 31, 1989. Tr. 69. Having done nothing to affirm the Agreements for seven months, Colonia may not ask them to be reinstated.

*Serious Questions Going to the Merits*

Colonia has not raised serious questions going to the merits. The unrefuted evidence by Lanvin regarding the substantial inconsistencies in the documents Colonia provided, and the presence of 100,000 pieces of Arpege in Europe, show that Colonia has not posed serious questions going to the merits of its claim that Lanvin wrongfully terminated the Agreements. Indeed, Colonia has not even raised issues of fact, and even sharp issues of fact are not themselves sufficient to support preliminary relief. *Gianni Cereda Fabrics, Inc., supra,* 335 F.Supp. at 281 (citing authority). Where, as here, the *non* movant has adduced substantial evidence that the *movant* breached the contract, clearly, the "serious questions" that the nonmovant raises do not avail the movant on its own motion. *Marisa Christina, Inc., supra,* 646 F.Supp. at 254.

*Balance of Hardships*

Colonia has not established that the balance of hardships tips decidedly in its favor. A balance of hardships tipping decidedly toward the party requesting preliminary relief means that it will suffer "real hardship" from the denial of preliminary relief, that is, a risk that its business will be destroyed *pendente lite. Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 58 (2d Cir.1979). Given the evidence concerning Colonia's size, strength and areas of growth, and the declining proportion of its business represented by Lanvin, it has not shown "real hardship."

Finally, a movant does not establish that the balance of hardships tips decidedly in its favor if the relief it requests would force its former supplier to endure an unsatisfactory relationship with a licensee it no longer trusts, while being deprived of any other means to market its product. *Joyce Beverages of New York, Inc., supra,* 555 F.Supp. at 280 (S.D.N.Y.1983); *Deltown Foods, Inc., supra,* 219 F.Supp. at 891–92.

## CONCLUSION

For the reasons stated above, the court finds that the defendant has not met the requisite burden to obtain a preliminary injunction. Defendant's motion is hereby denied.

SO ORDERED.