AFA DISPENSING GROUP B.V.
and Dispensing Technologies
B.V., Plaintiffs,

v.

ANHEUSER–BUSCH, INC., Defendant.

No. 10 Civ. 5565(VM).

United States District Court,
S.D. New York.

Aug. 18, 2010.

Matthew Joel Sava, Shapiro Mitchell Forman Allen & Miller LLP, New York, NY, for Petitioners.

Richard Corey Worcester, Howrey LLP, New York, NY, for Respondent.

## DECISION AND AMENDED ORDER

VICTOR MARRERO, District Judge.

By Order dated July 27, 2010, the Court denied the motion of plaintiffs AFA Dispensing Group B.V. ("AFA") and Dispensing Technologies B.V. ("DT") (together, "Plaintiffs") seeking a temporary restraining order and preliminary injunction (1) to order specific performance of contracts between Plaintiffs and defendant Anheuser–Busch, Inc. ("A–B") and (2) to enlarge the time the parties have to commence arbitration pursuant to the same contracts. The Court now sets forth its findings, reasoning, and conclusions.

## I. BACKGROUND [1]

Plaintiffs are Netherlands-based development and production companies that specialize in liquid dispensing systems. A–B, a corporation organized under the laws of Missouri, is a large producer of beer in America and maintains an executive office in New York City.

In 2008, A–B partnered with Plaintiffs to develop, produce, and sell a home draught product that dispenses malt beverages through an appliance that fits inside consumers' refrigerators. Both A–B and Plaintiffs have proprietary dispensing technologies ("Thunderbird" and "Flair", respectively) that can be used with the home draught product.

Plaintiffs and A–B initially agreed to use Plaintiffs' Flair technology in the home draught product. After being acquired by InBev, a Belgian beverage company, A–B communicated its desire to use Thunderbird exclusively and offered AFA the opportunity to supply the equipment for its production. AFA decided that entering the United States market with the nation's largest beer company outweighed its desire to use its own Flair technology in the draught product and agreed to forego the use of Flair in the new product. Consequently, in December 2009, the parties signed a series of agreements, including a Supply Agreement. (See Worcester Decl., Ex. A ("Supply Agreement").)

The Supply Agreement made AFA the exclusive supplier of the bottles to be used in the home draught product and contained a number of provisions relating to arbitration between the parties. First, § 17(a) requires that

> any controversy or dispute arising out of or in connection with this [Supply] Agreement its interpretation, performance or termination ("Dispute") that the Parties are unable to resolve within ninety (90) days after written notice by one Party to the other of the existence of such Dispute will be submitted to arbitration.

(Id. § 17(a).)

In addition, § 17(c) provides that

> [i]n the event of any Dispute, the parties shall continue to perform their respective obligations under this Agreement during the pendency of arbitration pro-

---

**1.** The facts below are taken from the following documents, and any exhibits and declarations submitted therewith: Verified Petition Pursuant to CPLR 7502(c) for a Temporary Restraining Order and Preliminary Injunction, dated July 18, 2010 ("Verified Petition"); Defendant Anheuser–Busch, Inc.'s Opposition To Plaintiffs' Request for a TRO or Preliminary Injunction, dated July 22, 2010; Decla-
ration of Corey Worcester in Support of Defendant Anheuser–Busch, Inc.'s Opposition to Plaintiffs' Motion for a Temporary Restraining Order, dated July 22, 2010 ("Worcester Decl."); Reply Affidavit of Ariel Gratch, dated July 23, 2010 ("Gratch Aff."). Except where specifically cited, no further reference to these documents will be made.

ceedings unless and until the arbitral tribunal otherwise orders.

(*Id.* § 17(c).)

Finally, § 17(b) stipulates that the parties are entitled to injunctive relief in certain circumstances relating to arbitration:

> [E]ach party shall be entitled to injunctive relief ... restraining the breach or threatened breach of each obligation under this Agreement and to specific performance of each obligation under this Agreement. The Parties agree that monetary damages would not be adequate compensation for any loss incurred by reason of a breach of any obligation under this Agreement ....

(*Id.* at § 17(b).)

The Supply Agreement also contains a non-competition clause in § 1(k), and § 7(g) provides that the non-competition requirement remains in force following termination, in certain circumstances, of the contract. Section 12 incorporates a separately executed non-disclosure agreement.

Soon after parties' agreements were in place, Ariel Gratch ("Gratch"), the managing director of AFA and DT, expressed concerns with the "market readiness" of Thunderbird. Tensions between A–B and Plaintiffs escalated and, on June 7, 2010, Gratch sent A–B an email demanding that A–B and AFA "immediately find an alternative to the current business deal." (*See* Worcester Decl., Ex. B at 3.) Gratch gave A–B two alternatives: (1) replace Thunderbird with AFA's Flair technology in the new product, or (2) continue with Thunderbird, which, according to Gratch, would require the complete severance of Plaintiffs' and A–B's relationship and "compensation ... for [AFA's] damages including its exclusion from other opportunities." (*Id.*) Gratch's June 7 email spawned further exchanges between AFA and A–B that eventually culminated in what can

charitably be described as a breakdown of their business relationship.

A–B replied to Gratch that his June 7 ultimatum amounted to a repudiation of the Supply Agreement and subsequently sent a letter requesting that Gratch provide "unqualified written assurance that [AFA] can and will fulfill all of its obligations under the Supply Agreement." (Worcester Decl., Ex. E at 3.) According to A–B, Gratch did not provide the requested assurance and A–B wrote to AFA, on July 9, 2010, stating, "[A–B] has no choice but to consider AFA's repudiation final." (*See id.*, Ex. G at 1.)

AFA, on the other hand, contends that it responded to A–B's request with sufficient unequivocal assurances. (*See* Verified Petition ¶ 30.) In response to A–B's July 9 letter, AFA, on July 14, 2010, sent to A–B a formal Notice of Dispute pursuant to § 17(a) of the Supply Agreement. (*See id.*, Ex. H ("Notice of Dispute").) In the Notice of Dispute, AFA declared that A–B was in "material breach" of § 17(c) of the Supply Agreement for terminating performance prior to the completion of arbitration. (Notice of Dispute at 4.) AFA stated that it intended to pursue an injunction if A–B did not "unequivocally confirm its commitment to perform" by July 16, 2010. (*Id.*)

On July 16, 2010, A–B filed a complaint in federal court in the Eastern District of Missouri, seeking declaratory relief that AFA repudiated and breached the Supply Agreement, as well as an injunction enforcing the Supply Agreement's confidentiality and non-compete provisions, and preventing AFA from forcing A–B to perform under the Supply Agreement. *See* Complaint, *Anheuser–Busch, Inc. v. AFA Dispensing Grp. B.V. & Dispensing Tech. B.V.*, No. 4:10–CV–0126 (July 16, 2010 E.D. Mo.) ("Missouri Complaint"). A–B

purports to have served AFA in that action through an office AFA maintains in Missouri.

Two days after learning of the Missouri Complaint, AFA filed the Verified Petition in New York State Supreme Court, New York County, on July 21, 2010, seeking to compel A–B's continued performance under the Supply Agreement pending the final determination of the parties' arbitration. (*See* Gratch Aff. ¶ 4 ("A[FA] seeks an order requiring [A–B] ... to continue performing the Supply Agreement....").) Before any action was taken in the state court, A–B, invoking diversity jurisdiction, removed Plaintiffs' petition to this Court on July 22, 2010. The Court held a telephone conference with the parties on July 22, 2010 and denied Plaintiffs' request for injunctive relief by Order dated July 27, 2010.

## II. *DISCUSSION*

### A. *THE FIRST–FILED RULE*

■ A–B argues that this action should be dismissed or stayed because the same issues are being litigated in a lawsuit earlier filed in the Eastern District of Missouri. The so-called first-filed rule provides that "[w]here an action is brought in one federal district court and a later action embracing the same issue is brought in another federal court, the first court has jurisdiction to enjoin the prosecution of the second action." *Meeropol v. Nizer*, 505 F.2d 232, 235 (2d Cir.1974). This rule "gives priority to the first-filed suit except where there are special circumstances which justify giving priority to the second-filed suit or a showing of a balance of circumstances favor[s] the second-filed suit." *CGI Solutions LLC v. Sailtime Licensing Grp., LLC.*, No. 05 Civ. 4120, 2005 WL 3097533, at *2 (S.D.N.Y. Nov. 17, 2005) (quotation marks omitted) (alteration in original). "The first-filed rule is not to

be applied mechanically but the party that seeks to deviate from the rule has the burden of demonstrating that circumstances justifying an exception exist." *Citigroup Inc. v. City Holding Co.*, 97 F.Supp.2d 549, 555–56 (S.D.N.Y.2000). The Court is persuaded that special circumstances here warrant an exception to the first-filed rule.

■ "Anticipatory filings constitute a special circumstance permitting departure from the first-filed rule." *CGI Solutions*, 2005 WL 3097533, at *3. In particular, "when a party sends a notice-of-suit letter to its opponent, and the opponent thereby files a declaratory judgment action, there is reason to find that the first-filed action is an anticipatory filing." *Id.* A gauge for measuring the effect of a notice-of-suit letter is how clearly the party sending the letter demonstrates its intention and resolve to file suit. *Compare Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 217–19 (2d Cir.1978) (letter stating that the opposing party would be "subject to a lawsuit for injunctive relief, damages and an accounting" unless they discontinued sales of the infringing product is sufficient notice-of-suit), *overruled on other grounds by Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585–86 (2d Cir.1990) *with Employers Ins. of Wausau v. Prudential Ins. Co. of Am.*, 763 F.Supp. 46, 48 (S.D.N.Y.1991) (letter asserting that party "hoped to avoid litigation" failed to sufficiently notify the opposing party of intent to litigate).

■ Here, the Notice of Dispute states in relevant part that A–B "has until 5PM EDT Friday July 16 to unequivocally confirm its commitment to perform under our [Supply] Agreement or it will face an injunction motion." (Notice of Dispute at 4.) By articulating a particular date and the specific form of relief sought, it is clear that AFA sufficiently communicated its in-

tent to litigate. Accordingly, the Court is persuaded that the Notice of Dispute qualifies as sufficient notice-of-suit communication.

Next, the Missouri Complaint was filed on July 16, 2010, two days after AFA's Notice of Dispute was sent and on the very day AFA intended to petition for injunctive relief against A–B. Accordingly, the Court finds that A–B's lawsuit was an anticipatory filing.

Additionally, the circumstances of this case counsel against denying jurisdiction. The abrupt manner in which A–B filed the Missouri Complaint—before responding to AFA's Notice of Dispute and without any other warning-indicates that A–B filed for the purpose of selecting a more favorable forum (not coincidentally in its hometown district), and not for the most efficient adjudication of their legal rights. *See CGI Solutions*, 2005 WL 3097533, at *4 (invoking an exception to the first-filed rule where the court observed that plaintiff was forum-shopping).

Finally, Plaintiffs have presented serious questions to the Court concerning whether they are subject to the personal jurisdiction of the Eastern District of Missouri as defendants in the Missouri Complaint. Though A–B asserts it served an AFA office in Missouri, AFA, in a sworn affidavit, represents it has no office, subsidiary or other contacts with Missouri. (*See* Gratch Aff. ¶ 15.) Additionally, A–B has not even attempted to show how personal jurisdiction in Missouri would be proper over DT, a company based in the Netherlands.

Accordingly, for the reasons set forth above, the Court will apply the anticipatory filing exception to the first-filed rule in the instant case and exercise jurisdiction over Plaintiffs' motion for injunctive relief.

## B. *TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION*

■ Temporary restraining orders and preliminary injunctions are "one of the most drastic tools in the arsenal of judicial remedies," and must be used with great care. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction. *See Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F.Supp.2d 577, 580 (S.D.N.Y.2002).

■ To obtain a preliminary injunction, the moving party must demonstrate "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair grounds for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, L.L.C. v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir.2004) (quotation marks omitted); *see also SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 83 (2d Cir. 2000) (standard for injunctive relief in aid of arbitration under N.Y. C.P.L.R. § 7502(c) requires showing of the same elements). "These elements must be established by a preponderance of the evidence." *Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*, No. 08 Civ. 2152, 2008 WL 759353, at *4 (S.D.N.Y. Mar. 20, 2008).

### 1. *Imminent and Irreparable Harm*

Plaintiffs argue that they will suffer imminent and irreparable harm because "the survival of AFA's only facility in the Netherlands is dependent on A–B's production." (Verified Petition at 3.) Additionally, AFA argues that a failure by the Court to issue a temporary restraining order and

preliminary injunction will have the effect of permitting A–B to work with another development and supplier partner, thus preventing AFA from effectively using its Thunderbird license.

 A showing of irreparable harm is the "single most important prerequisite" for issuance of a preliminary injunction. *Verzani v. Costco Wholesale Corp.*, No. 09–3770–cv, 387 Fed.Appx. 50, 51, 2010 WL 2838526, at *1 (2d Cir. July 21, 2010) (quotation marks omitted). To make this showing, the moving party must demonstrate that, absent a preliminary injunction, it will suffer "an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be redressed through a monetary award." *Payment Alliance Int'l, Inc. v. Ferreira*, 530 F.Supp.2d 477, 480 (S.D.N.Y.2007) (quotation marks omitted).

 The Court finds that Plaintiffs have failed to demonstrate sufficient imminent and irreparable harm. Plaintiffs' concerns about the functioning of AFA's Netherlands facility are couched entirely in generalizations and not sufficiently particularized to show the requisite injury. AFA does not provide the Court, for instance, with any indication of the number of employees that will be fired, the cost of the factory or specific partnerships that have been sacrificed. *See Litho Prestige, Div. of Unimedia Grp., Inc. v. News Am. Pub.*, 652 F.Supp. 804, 808 (S.D.N.Y.1986) ("Conclusory statements of loss represent an insufficient basis for a finding of irreparable harm.").

In addition, AFA's June 7 email demanding monetary compensation for the severance of AFA and A–B's partnership completely belies Plaintiffs' contention that the harm here would be irreparable and beyond money damages. *See Moore v. Consolidated Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir.2005) ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.").

In support of their showing of irreparable harm, Plaintiffs rely on § 17(b) of the Supply Agreement, which states, "each Party shall be entitled to injunctive relief . . . restraining the breach or threatened breach of each obligation under this [Supply Agreement] and to specific performance of each obligation under this [Supply] Agreement." (Supply Agreement § 17(b).) In addition, "[t]he Parties agree that monetary damages would not be adequate compensation for any loss incurred by reason of breach. . . ." (*Id.*) The Supply Agreement further provides that "the parties shall continue to perform their respective obligations . . . during the pendency of arbitration proceedings . . ." (*Id.* § 17(c).) Plaintiffs rely on a state Supreme Court case, *Project Orange Associates v. General Electric International, Inc.*, to argue that this language in the Supply Agreement requires the Court to bypass review of the factors normally required for a temporary restraining order and preliminary injunction. *See* 23 Misc.3d 764, 872 N.Y.S.2d 857 (N.Y.Sup.Ct.2009). The Court is not persuaded.

In *Project Orange*, the plaintiff sought an order to require the defendant's continued performance of obligations under a contract providing for the repair and maintenance of two gas turbine engines that supplied power to Syracuse University which, in turn, powered three hospitals. *Id.* at 858–59. The parties' contract contained a provision, similar to the one at bar, that required all performance to continue "during arbitration proceedings" or "during any legal proceedings." *Id.* at 859.

The Court finds *Project Orange* inapposite to this case. First, in *Project Orange*, the public interest clearly favored injunctive relief, as the continued operation of three hospitals and a university depended on the defendant's performance, which under the parties' agreement had been ongoing for about ten years. Here, AFA has not persuaded the Court that a contract for the development and Netherlands-based production of a beer dispenser presents a comparable public interest. Second, *Project Orange* merely found that it was "not clear" under New York law whether a petitioner must satisfy the traditional injunction factors when confronted with such an arbitration provision, *id.* at 861, and applied the traditional test in arriving at its final determination. *Id.* at 862–63. Finally, though Plaintiffs praise *Project Orange* as "the leading decision by the New York Supreme Court," (Gratch Aff. ¶ 29), Plaintiffs fail to cite, nor is the Court aware of, any other case that cites *Project Orange*, much less any judicial precedent that reads the decision as broadly as Plaintiffs urge here. *Project Orange* cannot be read to allow business entities to deputize a court by means of private contract to issue per se injunctions in all cases where litigants stipulate to continued performance during the pendency of arbitration.

Accordingly, the Court finds that Plaintiffs have failed to show that an injunction is necessary to preserve the arbitration panel's ability to effectively hear and determine claims for money damages as a consequence of each party's alleged repudiation of the Supply Agreement. When it comes to contracts, "damages are the rule, not the exception." *Lanvin Inc. v. Colonia, Inc.*, 739 F.Supp. 182, 195 (S.D.N.Y. 1990).

### 2. *Likelihood of Success on the Merits*

Plaintiffs must show that they are more likely than not to prevail if this action should be tried in court. *See Davila Pena v. Morgan*, 149 F.Supp.2d 91, 94 (S.D.N.Y. 2001). Here, Plaintiffs seek a court order requiring A–B "to fully perform such agreements as required by Section 17(c) of the Supply Agreement pending the final determination of the parties' arbitration." (Verified Petition at 24.)

A–B agrees that certain provisions of the Supply Agreement survive termination and that each party must continue performing them during the pendency of arbitration. The dispute between the parties concerns whether the Supply Agreement has been terminated and exactly which provisions must continue to be performed. AFA argues that the entire contract must continue to be performed while AFA suggests that only provisions that expressly survive termination—agreements concerning confidentiality and non-competition—are relevant.

 Aside from simply asserting their position, Plaintiffs have made no effort to explain why their interpretation of the Supply Agreement should necessarily prevail over A–B's. Upon review of the Supply Agreement, the Court is not persuaded that AFA's interpretation necessarily carries the day. On this point, the Court stresses here that it suggests no position on the ultimate determination of whether the Supply Agreement has been repudiated by either party.

### 3. *Sufficiently Serious Questions and a Balance of the Hardships*

 As an alternative to the "likelihood of success on the merits" standard, the "serious questions" standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on

the merits of the underlying claims, but where the tilt of the equities and the net private and public hardships outweigh the benefits of not granting the injunction. *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir.2010). The overall burden under this prong is no lighter than under the "likelihood of success" standard. *Id.* A balance of hardships tipping decidedly toward the party requesting preliminary relief means that it will suffer "real hardship" from the denial of preliminary relief. *Lanvin,* 739 F.Supp. at 196.

 In particular, "[e]njoining parties to do business with each other has been held to be a particularly undesirable result, where ... there is no longer a relationship of trust." *Id.* at 195 (citation omitted). Such a result "is also undesirable because it might require the Court to supervise and monitor the relationship." *Id.* Here, the requested relief would force A–B and AFA, both of which admit that there is "very little commonality or interest" between the two companies, to endure an unproductive business partnership. (*See* Worcester Decl., Ex. B at 2.)

Accordingly, the Court is not persuaded that the balance of hardships tips "decidedly" in AFA's favor. *See Lanvin,* 739 F.Supp. at 192.

### III. *ORDER*

For the preceding reasons, it is hereby

**ORDERED** that the Court's Order dated July 27, 2010 herein is amended to incorporate the discussion set forth above; and it is further

**ORDERED** that the motion of plaintiffs AFA Dispensing Group B.V. and Dispensing Technologies B.V. for a Temporary Restraining Order and Preliminary Injunction is DENIED; and it is finally

**ORDERED** that the parties are directed to confer and prepare a proposed Case Management Plan to be submitted in the form provided by the Court, for the Court's review and approval at an initial conference scheduled for September 10, 2010 at 10:30 a.m.

**SO ORDERED.**